**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**William Benjamin PAXTON, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 13, 2003.
Filed March 27, 2003.

Victoria H. Vidt, Pittsburgh, for appellant.

Francesco L. Nepa, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: MUSMANNO, LALLY–GREEN and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 William Benjamin Paxton appeals the July 9, 2001 judgment of sentence of two consecutive terms of life imprisonment without parole, plus an additional twenty (20) to forty (40) years imprisonment, imposed after a jury found him guilty of two counts first degree murder,[1] two counts robbery,[2] two counts abuse of corpse [3] and one count each of criminal conspiracy [4] and carrying a firearm without a license.[5] Appellant shot his victims, who had been lured to the scene to purchase drugs, execution-style in the back of the head. Appellant and his co-defendant, Craig Alan Hairston, in an attempt to destroy evidence, then burned the victims' car and bodies.

¶ 2 Appellant first argues his right to appeal has been impeded by the unexplained disappearance of one of four audiotapes on which he gave statements to the police. The tapes were entered into evidence and played for the jury but were not transcribed in the notes of testimony. Now, on appeal, appellant argues the tapes

---

1. 18 Pa.C.S.A. § 2502(a).

2. *Id.,* § 3701.

3. *Id.,* § 5510.

4. *Id.,* § 903.

5. *Id.,* § 6106.

should have been suppressed due to their coercive nature, but his avenue of redress has been hampered because one of the four tapes, number four (4), is missing and is unable to be located despite efforts by both the defense and the prosecution. Appellant concedes, however, that he does possess a transcript of the missing tape.[6] He argues that the absence of the actual audiotape, however, precludes him from proving the existence of voice inflections and certain background noises that would establish the statement was coerced. Appellant argues

a dry transcript by its very nature cannot provide an equivalent picture when there is so much information that may be gleaned from outside the parameters of the mere words that were spoken. Vocal inflections and background noises could provide important and objective clues regarding the circumstances surrounding the interrogation. For instance, the audio tape could give indications of the physical exhaustion present in the voice of the person giving the statement. A tape would also demonstrate the tone of voice used by police detectives during the questioning. These clues to what actually transpired in the interrogation room can never be part of that same occurrence.

These aural clues are relevant to a determination of whether the statement given was done so through the free and unconstrained choice of the maker.

Appellant's brief at 24. On the basis that the fourth audiotape is unable to be located, thereby impeding his appellate rights, appellant argues he is entitled to a new trial.

¶ 3 The cases relied upon by appellant involve situations in which the *transcript* of the proceedings has been unavailable. *See Commonwealth v. Shields,* 477 Pa. 105, 383 A.2d 844 (1978); *Commonwealth v. Goldsmith,* 452 Pa. 22, 304 A.2d 478 (1973); *Commonwealth v. Homsher,* 264 Pa.Super. 271, 399 A.2d 772 (1979); *Commonwealth v. Dixon,* 253 Pa.Super. 383, 385 A.2d 391 (1978); *Commonwealth v. Fisher,* 247 Pa.Super. 187, 372 A.2d 1 (1977). None of these cases presents a situation such as that with which we are now faced. Accordingly, we must consider generally what is necessary for "meaningful appellate review" to occur.

In order to ensure a defendant's right to meaningful appellate review, this Court requires that he or she be furnished a full transcript or other equivalent picture of the trial proceedings. With this in mind, it is settled law that in order for a defendant to establish entitlement to relief based on the incompleteness of the trial record, he must first make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the [record].

*Commonwealth v. Marshall,* 571 Pa. 289, 812 A.2d 539, 551 (2002). Pennsylvania Rule of Appellate Procedure 1923, Statement in Absence of Transcript, states, in pertinent part, "if *no report* of the evidence or proceedings at a hearing or trial was made, or *if a transcript is unavailable,*" the parties may agree to a statement of the proceeding as they best recollect. (Emphasis added.)

¶ 4 The jury, sitting as the trier of fact, is charged with evaluating and weighing not only the evidence presented but also the credibility of the witnesses. *See Commonwealth v. Riley,* 811 A.2d 610

---

**6.** Appellant possesses transcripts of the third and fourth tapes; the Commonwealth possesses three of the actual audiotapes, numbers one, two and three. Only audiotape number four is missing at this time.

(Pa.Super.2002). The witnesses' credibility may be assessed by the content of the testimony and the manner in which it is presented, e.g., did the witness "appear" forthright in his demeanor and delivery. It is not the role of an appellate court, however, to pass on the credibility of witnesses or to act as the trier of fact, and an appellate court will not substitute its judgment for that of the fact-finder. *Commonwealth v. Lutes*, 793 A.2d 949 (Pa.Super.2002).

¶ 5 This Court is never privy to live courtroom presentations of testimony but relies on trial transcripts of the proceedings. There is a purpose to that rule; were it otherwise, we could be swayed by witness demeanor, voice inflections, body movements, sighs of frustration, sorrow, joy or pain, thereby logically and improperly placing us in the unenviable and improper position of fact-finder. Our constitution identifies the jury, or in the case of a bench trial, the judge, as the assessor of credibility and fact. This same logic prevents us from finding merit to appellant's argument he is denied his appellate rights by the Commonwealth's (and his) inability to produce the actual audiotape of the statement made by him to the police. The suggested "exhaustion" that may be able to be identified in the appellant's voice, and/or the "frustration" or "threatening tones" purportedly audible in the officers' voices, are not for this Court's ears. Those factors are for the trier of fact. The jury in this case heard all of the tapes with the various inflections, tones and background noises and chose what weight, if any, to place on them. We find, therefore, given this reasoning and the existence of a transcribed copy of the taped interview, the parties' inability to produce one of four actual audiotapes does not preclude meaningful appellate review or violate appellant's direct appeal rights. A new trial is not warranted on this basis.

■ ¶ 6 In the alternative, appellant argues the tapes should have been suppressed as the statements he made to police, "were obtained under such coercive circumstances that appellant's will was overborn [sic] and the statements were thereby rendered involuntarily made." Appellant's brief at 31. The inculpatory statements, according to appellant, were the result of psychological coercion. Appellant contends police "hounded" him over the course of two days, from 9:00 a.m. January 4, 2000 until he gave his last statement on the evening of January 5, 2000. *Id.* Appellant argues that when he spoke with officers, between midnight and 6:00 a.m. on January 5, 2000, he was sleep-deprived and, despite having been assured he was not a suspect was placed in an interrogation room and isolated from his brother who had accompanied him to the station. *Id.* at 34–35. After being allowed to go home at approximately 6:00 a.m., the officers once again arrived at appellant's home, at approximately 9:00 a.m. that day, and asked him to accompany them to the station ostensibly "to look at some photographs." *Id.* at 37. Appellant agreed to return with the officers, despite being tired and awaiting a return call from an attorney whom he had called. *Id.* at 38. Appellant also argues the statements he made were not preceded by *Miranda*[7] warnings, and he was wrongly denied right to counsel. "Based upon a totality of the circumstances as set forth in the chronology above, the manipulative techniques employed by the detectives during the two-day interrogation renders the statements obtained from Mr. Paxton involuntary." Appellant's brief at 39–40.

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 7 The Pennsylvania Supreme Court has set forth the following standard of review to be employed when considering a challenge to a trial court's denial of a motion to suppression.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts an [sic] may reverse only if the legal conclusions drawn therefrom are wrong.

*Commonwealth v. Colon*, 777 A.2d 1097 (Pa.Super.2001), *appeal denied*, 567 Pa. 736, 788 A.2d 372 (2001), *quoting Commonwealth v. Hawkins*, 549 Pa. 352, 375–76, 701 A.2d 492, 504–505 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998) (citations omitted). "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." *Commonwealth v. Templin*, 568 Pa. 306, 310, 795 A.2d 959, 961 (2002).

> The test for determining the voluntariness of a confession and the validity of a waiver looks to the totality of the circumstances surrounding the giving of the confession. Some of the factors to be considered include: the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion.

*Commonwealth v. DeJesus*, 567 Pa. 415, 430, 787 A.2d 394, 403 (2001), *cert. denied*, — U.S. —, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002).

> In determining voluntariness, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. By the same token, the law does not require the coddling of those accused of crime. One such need not be protected against his own innate desire to unburden himself.

*Templin, supra* at 317, 795 A.2d at 966 (quotations and citations omitted).

¶ 8 *Miranda* warnings are necessary only when the suspect is subject to custodial interrogation. *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116 (2001). For a *Miranda* waiver to be valid, it must be made knowingly, voluntarily and intelligently. *DeJesus, supra*. "[T]he waiver must be the product of a free and deliberate choice rather than intimidation, coercion, or deception, and must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 430, 787 A.2d at 402 (quotations omitted).

¶ 9 A review of the record indicates appellant made himself an ally of the police so as to deflect attention from himself and pin the murders of Edinboro University students Jeremy Lindsey and Joseph Clayton on someone else; he gave a statement only after he realized his plan was not working. He was read his *Miranda* warnings numerous times and each time he chose to speak with the police.

¶ 10 On the morning of January 4, 2000, Pittsburgh City Police appeared at appel-

lant's home to discuss the horrendous murder of two young college men, both who attended Edinboro University along with appellant and were acquaintances of his. Appellant was advised he was not a suspect, and he chatted with the detectives for 15 to 20 minutes. When the officers left, they gave appellant their cards and told appellant to call if he recalled any helpful information. Later that morning, in response to a telephone call by appellant, officers again traveled to appellant's home and spoke to him for 15 to 20 minutes. Appellant advised the detectives he had not seen the victims in over a week and, when the detectives left, appellant gave them the address of where he could be reached when he returned to Edinboro the next day.

¶ 11 Later that night, near midnight, two other detectives and a FBI special agent returned to appellant's home. The officers blamed the lateness of their visit on the fact appellant was returning to Edinboro the following day, and they wanted him to come to the station to view photographs of other acquaintances of the decedents. Told once again he was not a suspect, but a mere Pittsburgh link to the deceased Edinboro students, appellant came to the station of his own accord, accompanied by his brother (N.T., Suppression Hearing, 11/13–15/00, at 38–40). Two officers spoke with appellant for approximately one hour, during which time appellant's brother was in an adjacent room. Appellant confirmed the officers' understanding that one of the decedents indeed had been involved with the sale of marijuana at Edinboro.

¶ 12 When the officers concluded their interview with appellant, appellant asked them if he could speak with one of the detectives who had been at his home earlier that morning, Detective Kevin Kraus. *Id.* at 42. Detectives Kraus and Dale Ca-

nofari came into the unlocked interrogation room, and appellant offered detailed information concerning drug transactions between one of the victims and an individual named Larry Richardson, also known as "Goob." *Id.* at 73. The detectives were very interested in this alleged drug dealing, concluding "Goob" was a possible murder suspect. Detective Canofari read appellant a "preinterrogation warning [*Miranda*] form concerning drug transactions. [Appellant] said he didn't mind." *Id.* at 74. Appellant read the form, signed it, acknowledged his rights and expressed his desire and willingness to speak without counsel present. *Id.* Appellant was advised again that he was not a suspect, the door to the room was open, and he was free to leave.

[Detective Canofari]: I don't think there was any question he could have left. The door was open and it was just a friendly conversation, a witness that we enjoyed having. He was very easy to talk to and there was no problem. *Id.* at 75.

¶ 13 The statement appellant subsequently offered was tape-recorded, but not before he again was read his rights, and he agreed to waive them. *Id.* at 77. According to Detective Canofari, the statement was not the result of an interrogation. "[I]t was an interview. It was non-confrontational, between myself and Detective Kraus. [A]ppellant was very forthcoming with information and it was just something we don't see all the time." *Id.* at 78. After appellant drove with the detectives to the scene of the alleged drug transaction, the detectives drove him home at about 6:00 a.m. The record indicates appellant was with the detectives for approximately six hours, between midnight and 6:00 a.m.

¶ 14 At approximately noon that day, January 5th, the officers returned to ap-

pellant's home and asked him to accompany them to the station to view a photo array, possibly identify the suspect Richardson, and clarify some details regarding their previous discussion. *Id.* at 120. Officers told appellant that based on information he had provided, Richardson had been arrested possessing a handgun and marijuana. Appellant again was read his *Miranda* rights, he indicated his understanding of those rights, waived his right to have counsel present while he spoke to the officers, and signed the waiver form. *Id.* at 121–124. Appellant agreed to tape-record his statement, and he proceeded to admit he had "set up" the drug transaction that resulted in the victims' deaths. *Id.* at 124–125. The statement was given between 3:29 p.m. and 3:50 p.m. on January 5, 2000. It was during this statement that appellant first indicated co-defendant Hairston's possible involvement. A little past 4:00 p.m., appellant drove with detectives to the scene of the shooting and a spent casing was recovered. At this point, appellant admitted he was a witness to the shooting. Due to a few discrepancies in appellant's story, the detectives' suspicions were aroused and, at 5:23 p.m., appellant was placed under arrest for his involvement with the murders. *Id.* at 130.

¶ 15 When they returned to the station, appellant was read his *Miranda* rights for the third time, he acknowledged his rights, signed the document, declined counsel and agreed to speak with the detectives. *Id.* at 182–183. Between that time, 7:00 p.m. and 1:00 a.m., appellant offered two verbal statements that both were reduced to tape-recorded statements.[8] *Id.* at 184.

8. The first taped statement was given between 7:54 p.m. to 8:11 p.m., and the second taped statement was given between 10:04 p.m. and 10:20 p.m. (N.T., 11/13–15/00, at 184, 186).

9. Regardless of whether or not appellant had retained the services of Attorney Oakes, he intelligently and knowingly waived his right

Also in this six-hour interim, appellant was arraigned, spent some time alone, was given snacks and soft drinks and was allowed to use the facilities.

¶ 16 We agree with the suppression court's decision to deny appellant's motion to suppress the four audiotapes on which he offered statements. As the suppression court concluded:

[Appellant] was a healthy, reasonably intelligent, third year college student-athlete who willingly spoke with police, initially feigning cooperation with them to deflect suspicion from himself as he fed them lie after lie. Ultimately, th[r]ough guilt and /or recognition that his house of cards was toppling in on him, defendant confessed to setting up and murdering his college chum. His will was not overborne by police tactics. The argument that his statements to police were involuntarily made was properly rejected.

The defendant also argues that the statements were made in violation of his right to counsel, which he claims to have invoked. The testimony of Emanuel Oakes, Jr., Esq., clearly indicates that he was not retained by nor did he represent the defendant.[9] The defendant was given his *Miranda* rights on numerous occasion and each time he waived them, as evidenced by the waiver forms and taped statements. [The court] accepted the detectives' testimony that defendant never requested an attorney prior to giving any of his statements.

to counsel being present while he spoke to police and he voluntarily offered statements. *See Commonwealth v. DeJesus*, 567 Pa. 415, 430, 787 A.2d 394, 403 (2001), *cert. denied,* —— U.S. ——, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002).

Supplemental Opinion, O'Brien, Wm. T., J., 4/26/02, at 5.

¶ 17 Lastly, appellant argues the Commonwealth committed prosecutorial misconduct by vouching for the veracity of one of its witnesses, Evanuel Tate, and trial counsel was ineffective for failing to object to this misstep and request a mistrial on this basis.

In the present case, the prosecutor impermissibly endorsed the testimony of Evanuel Tate, using the power inherent in the prosecutor's office to vouch for the witness's credibility. Not only did the prosecutor vouch for Tate's credibility in general terms by stating that Tate had "nothing to gain or lose in this case," the prosecutor crossed the line by stating specifically that Evanuel Tate "was a credible witness." The Assistant District Attorney went even further by stating that Tate wasn't "some hobo, some bum that would say anything to save his skin," and that Tate was "essentially a nice guy." These characterizations are all within the jury's province to make as part of their evaluation of the witness's credibility.

Appellant's brief at 50.

¶ 18 Pursuant to *Commonwealth v. Grant*, 813 A.2d 726, 2002 Pa.LEXIS 3126 (Pa.2002), we are constrained to decline the opportunity to address this ineffectiveness claim, however we do so without prejudice to appellant to raise it in a timely-filed PCRA petition.

¶ 19 Having found each of appellant's arguments devoid of merit, we affirm the July 9, 2001 judgment of sentence.

¶ 20 Judgment of sentence affirmed.