**Commonwealth v. Smith**

C.P. of Lackawanna County, no. 97 CR 1101.

*Carole Colombo, assistant district attorney,* for Commonwealth.

*Charles Witaconis, assistant public defender,* for defendant.

MINORA, *J.,* October 7, 2004—

## I. INTRODUCTION

Currently before the court on a reversal and remand from the Superior Court of Pennsylvania is the issue of the voluntariness of defendant's confession. On August 3, 2001, the Superior Court of Pennsylvania (no. 1357 MDA 2000) issued an order indicating that *Miranda* warnings were not applicable to the case at hand. However, the court further stated that:

"This does not, however, end the analysis of whether appellee's statement is admissible under *Commonwealth v. Nester*, [551 Pa. 157, 162,] 709 A.2d 879, 882 (1998). We must still examine the totality of the circumstances surrounding the interrogation to determine if his confession was voluntary. Because the trial court did not conduct this analysis and the record lacks sufficient information for our review, we remand to the suppression court for a determination of whether appellee voluntarily confessed." (See Superior Court decision no. 1357 MDA 2000 at p. 5.)

Counsel for the parties met on April 5, 2004, and agreed this issue could be decided on the evidentiary record and transcripts from the suppression hearings of September 20, 1999 and March 31, 2000.

The parties have submitted supplemental briefs and the remand directive is now ripe for disposition.[1]

## II. SOLE ISSUE ON REMAND

A. *Was the Confession of the Defendant Involuntary or Voluntary Such As To Require or Not Require Its Suppression?*

## III. DISCUSSION

A. *The Standards for a Voluntary Confession*

As indicated by the Superior Court, the controlling authority in determining whether a confession was vol-

---

1. The underlying charges against defendant include rape and aggravated indecent assault (18 Pa.C.S. §§3121 and 3125).

untary in the Child Protective Services setting such as this case is *Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879 (1998).

As indicated in *Nester, supra,* when deciding a motion to suppress, the touchstone issue is whether the confession was voluntary. *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

Voluntariness is determined by the totality of the circumstances surrounding the confession. *Fulminante, supra; Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181 (1996).

The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. *Miller v. Fenton,* 796 F.2d 598 (3d Cir. 1986), *cert. denied sub nom., Miller v. Neubert,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily. *Commonwealth v. Watts,* 319 Pa. Super. 179, 465 A.2d 1288 (1983), *aff'd,* 507 Pa. 193, 489 A.2d 747 (1985); *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

We must remember that the voluntariness standard derives from the right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and the right to due process guaranteed by the

Fourteenth Amendment to the United States Constitution. *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Miller, supra.*

As indicated by the Superior Court, their decision indicated that *Miranda*[2] warnings were not required to be given the defendant Bruce Smith. (See page 4 of said decision filed at no. 1357 MDA 2000.)

However, although he was not in "custody" by a government official, the employees of the La Sa Quick facility where the defendant was situated had an obligation to report child abuse to law enforcement personnel. 23 Pa.C.S. §6311; 23 Pa.C.S. §6313; 55 Pa. Code §3490.55.

Therefore, we are directed and must still examine the totality of the circumstances surrounding the interrogation to determine if the confession was voluntary because even a non-custodial interrogation might possibly, in some situations, by virtue of some special circumstances, result in an involuntary confession. *Beckwith v. United States,* 425 U.S. 341, 347-48, 96 S.Ct. 1612, 1616-17, 48 L.Ed.2d 1 (1976).

Ultimately, when assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors:

(1) the duration and means of the interrogation;

(2) the physical and psychological state of the accused;

(3) the conditions attendant to the detention;

(4) the attitude of the interrogation; and

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(5) any and all other factors that could drain a person's ability to withstand suggestion and coercion. See *Commonwealth v. Jones, supra; Commonwealth v. Nester,* 551 Pa. 157, 162, 704 A.2d 879, 882 (1998); *Commonwealth v. DeJesus,* 567 Pa. 415, 430, 787 A.2d 394, 403 (2001); *Commonwealth v. Paxton,* 821 A.2d 594 (Pa. Super. 2003).

## B. *Analysis of the* Nester *Factors*

By way of further background and keeping in mind the relevant time line regarding the incriminating statements at issue, the defendant was confined by court order for unrelated charges at the La Sa Quick facility for juveniles charged with sexual offenses. The first interview was conducted by Kenneth Dady, a La Sa Quick family therapist on March 15, 1997. This interview resulted from a call placed by the defendant's mother (an interested adult normally contemplated as protecting the juveniles' interest) informing La Sa Quick that the defendant has sexually abused his stepsister. During this interview, the defendant made the first of his incriminating statements. Mr. Dady, a mandatory reporter of sexual abuse by law, then called the Child Abuse Hotline and the defendant's juvenile probation officer.

Subsequently, the defendant met with the second interviewer, Karen Choate, a clinical program specialist, regarding the subject matter of the incriminating statements. Over a four-month period, Ms. Choate met with the defendant approximately three times a week. On April 9, 1997, the defendant signed a sexual disclosure form at the behest of Ms. Choate.

Finally, on April 23, 1997, Dawn Harer of Lycoming Children and Youth Services interviewed the defendant

at the La Sa Quick facility, where more incriminating statements were made. Eventually, Children and Youth Services referred the matter to law enforcement.

It is during the Dady, Choate and Harer interviews that we must apply the standards for voluntariness set forth above by *Nester; DeJesus* and *Paxton, supra.*

i. Findings of Fact (The Kenneth Dady Interview)

(1) Kenneth Daty (actually Dady) was a family program specialist whose duties consisted of therapy with the family. (N.T. September 20, 1999 p. 12.)

(2) He was employed at La Sa Quick facility for juveniles charged with sexual offenses. *(Supra.)*

(3) Mr. Dady had sessions with the defendant and/or his family. (N.T. September 20, 1999 p. 14.)

(4) Sessions with the defendant often were informal such as pulling of the defendant off to the side to talk to him or in Mr. Dady's office with the door open. (N.T. September 20, 1999 p. 17.)

(5) La Sa Quick facility was not a secure facility that was locked down. Children could run away. (N.T. September 20, 1999 p. 17.)

(6) When restraining individuals the facility has a strict hands-off policy. (N.T. September 20, 1999 p. 18.)

(7) In March of 1997, Mr. Dady received a report that the defendant had sex with his younger sister, Michelle. (N.T. September 20, 1999 p. 20.)

(8) He subsequently took the defendant to his office where the defendant eventually admitted having sex with his sister, Michelle. (N.T. September 20, 1999 pp. 20-27.)

(9) No one was present in the office other than Mr. Dady and defendant. (N.T. September 20, 1999 p. 27.)

(10) The defendant was not restrained in any way. (N.T. September 20, 1999 p. 27.)

(11) The information was sent to defendant's probation officer and Children and Youth Services. (N.T. September 20, 1999 p. 28.)

(12) On cross-examination, Mr. Dady admits his job was to counsel Bruce Smith regarding conflicts within the dynamics of the family. (N.T. September 20, 1999 p. 36.) (*I.e.,* provide therapy to help the kids that were in the program as well as their families.) (N.T. September 20, 1999 p. 37.)

(13) On cross-examination, Mr. Dady admitted that the defendant was at La Sa Quick under a court order and if he left the facility, La Sa Quick would have to report this to the state police as it would be tantamount to escape. (N.T. September 20, 1999 p. 37.)

(14) Mr. Dady admitted he was a mandatory reporter of child abuse incidents and such reporting could result in criminal charges. (N.T. September 20, 1999 p. 41.)

(15) Mr. Dady admitted no written consent form or *Miranda* warnings were given. (N.T. September 20, 1999 pp. 43-44.)

(16) Mr. Dady admitted he did not give the defendant an opportunity to have an interested adult or guardian present. (N.T. September 20, 1999 pp. 44-45.)

(17) Mr. Dady testified that his primary concern with disclosing the incident at issue to authorities is to make sure the victim is taken care of and then to help defendant with his therapy. (N.T. September 20, 1999 p. 52.)

(18) Mr. Dady testified there are no security guards at La Sa Quick facility. (N.T. September 20, 1999 p. 54.)

ii. Findings of Fact (The Karen Choate Interview)

(1) Karen Choate was employed at La Sa Quick facility as the defendant's clinical program specialist. (N.T. September 20, 1999 p. 56.)

(2) She saw him three times a week for a four-month period. (N.T. September 20, 1999 p. 57.)

(3) Her primary purpose was to engage the defendant in therapy and education using a "Pathways book" in which the defendant described he had anal and vaginal sex with his sister Michelle Smith. (N.T. September 20, 1999 pp. 55-60.)

(4) The Pathways book was not to be sent to law enforcement, juvenile probation or the state police. (N.T. September 20, 1999 p. 60.)

(5) The purpose of the Pathways book was for the defendant to gain a better understanding of his sexual behaviors. (N.T. September 20, 1999 pp. 60-61.)

(6) She discussed the incidents regarding Michelle Smith with the defendant in her office. (N.T. September 20, 1999 p. 63.)

(7) Her office was average sized and in an open setting. (N.T. September 20, 1999 p. 63.)

(8) She discussed the Michelle Smith incidents with the defendant after Mr. Dady had given her the facts about the disclosure. (N.T. September 20, 1999 p. 63.)

(9) She had defendant fill out a sexual offense disclosure form in her office and told the defendant the county

was requesting that the form be filled out. (N.T. September 20, 1999 p. 65.)

(10) On cross-examination, Ms. Choate admitted she knew the defendant was placed at La Sa Quick under a court order.

(11) She admitted she was a mandatory sexual abuse reporter by law. (N.T. September 20, 1999 pp. 68-69.)

(12) She testified that she learned of the sexual contact between defendant and his sister, Michelle, from Mr. Dady, and talked to defendant about that the next day. (N.T. September 20, 1999 p. 70.)

(13) She talked to the defendant at least three times about the incident with Michelle. (N.T. September 20, 1999 p. 70.)

(14) She testified that the "Pathways book" goes into the defendant's regular file at La Sa Quick facility. (NT. September 20, 1999 p. 72.)

(15) She testified that a sexual disclosure form was signed by defendant and, though she told him verbally it could be turned over to certain agencies, no written consent was acquired. (N.T. September 20, 1999 p. 74.)

(16) At no time was there an interested adult present with the defendant, nor was an opportunity given the defendant to have one present. (N.T. September 20, 1999 p. 75.)

(17) Mr. Dady requested that Ms. Choate secure the sexual disclosure form for juvenile probation. (N.T. September 20, 1999 p. 76.)

(18) Again she admitted she was a mandatory reporter by law in this case. (N.T. September 20, 1999 p. 77.)

(19) On re-direct exam, Ms. Choate again testified that she verbally told the defendant she would have to report the sexual incident information, but that no adults were present in this interview context except for family members. (N.T. September 20, 1999 p. 78.)

(20) On re-cross, Ms. Choate was told to have the defendant fill out the sexual disclosure statement at the request of Mr. Dady and at that point she did not feel there was a possibility of criminal charges. (N.T. September 20, 1999 pp. 78-79.)

iii. Findings of Fact (The Dawn Harer Interview)

(1) Dawn Harer was, at all times relevant, a child protective services worker with Lycoming County Children and Youth and assigned to primarily investigate reports of child abuse and neglect reported to her office. (N.T. March 31, 2000 p. 5.)

(2) She was contacted by Lackawanna Children and Youth Services to investigate the incidents at issue in this case. (N.T. March 31, 2000 p. 6.)

(3) She testified that she conducted an interview of the defendant on April 23, 1997 at 1:05 p.m. at La Sa Quick facility and the interview lasted a half hour. (N.T. March 31, 2000 p. 11.)

(4) The interview was conducted in a conference room or office type room and the people present were Harer and the defendant. (N.T. March 31, 2000 p. 11.)

(5) There were no bars on the windows. (N.T. March 31, 2000 p. 12.)

(6) Defendant was escorted into the room by a counselor and he was not handcuffed or shackled in any way. (N.T. March 31, 2000 p. 12.)

(7) She said the defendant told her he knew why she was there to interview him. (N.T. March 31, 2000 p. 12.)

(8) She did not *Mirandize* the defendant. (N.T. March 31, 2000 p. 13.)

(9) She never gave defendant any conditions prior to his interview about what would happen to him after his interview. (N.T. March 31, 2000 pp. 13-14.)

(10) She did not tell him that she was arresting him. (N.T. March 31, 2000 p. 14.)

(11) She did not tell him he could not leave prior to the interview being completed. (N.T. March 31, 2000 p. 14.)

(12) Defendant provided a narrative to her of the pattern of sexual conduct with his sister, Michelle. (N.T. March 31, 2000 pp. 14-16.)

(13) She testified she explained the investigative process to defendant and that report would be given to Lackawanna County Children and Youth Services who would make a final determination on the case. (N.T. March 31, 2000 p. 17.)

(14) On cross-examination, Ms. Harer testified the purpose of her interview with defendant was to confirm information given to her by Lackawanna County CYS. (N.T. March 31, 2000 p. 20.)

(15) She admitted she knew she would be asking defendant about specific questions regarding sexual relations with his sister. (N.T. March 31, 2000 p. 21.)

(16) She was a mandatory reporter of child abuse. (N.T. March 31, 2000 p. 21.)

(17) She never told defendant what his legal rights might be. (N.T. March 31, 2000 p. 23.)

(18) She knew he was a minor. (N.T. March 31, 2000 p. 23.)

(19) She never informed defendant he could have an adult present nor gave him an opportunity to do so prior to the interview. (N.T. March 31, 2000 p. 23.)

(20) She never advised him of a right to consult a lawyer. (N.T. March 31, 2000 p. 23.)

(21) All the words in the report were words of her own choosing. (N.T. March 31, 2000 p. 25.)

(22) Ms. Harer never told defendant he could terminate the interview and walk out of the room. (N.T. March 31, 2000 p. 28.)

(23) She never informed him of any options he may have had prior to the interview. (N.T. March 31, 2000 p. 29.)

(24) She only told defendant about reporting the results of her interview to Lackawanna County Children and Youth Services *after* the interview was conducted. (N.T. March 31, 2000 p. 30.)

(25) The record further indicates defendant was at La Sa Quick pursuant to a court order and was not there voluntarily. (N.T. March 31, 2000 p. 32.)

## C. *Final Analysis and Conclusion*

The court is still not convinced that the Commonwealth has proven by a preponderance of the evidence that the totality of the circumstances show that the defendant's statements were voluntary. *Commonwealth v. Watts, supra; Colorado v. Connelly, supra.*

First of all, it is clear from the record that defendant was confined to La Sa Quick pursuant to a court order.

He could not leave on his own volition without penalty of law enforcement.

Secondly, while formal *Miranda* warnings were not required, the defendant was never clearly advised that all the interviewers were mandatory reporters under the Child Protective Services Act, 23 Pa.C.S. §6311, nor was he informed fully of the ramifications of any statements he would make to them.

Moreover, the defendant was a juvenile who clearly was not afforded an opportunity to have an interested adult present during any of the interviews. *In the Interest of C.L.,* 714 A.2d 1074, 1075 (Pa. Super. 1998); *Commonwealth v. Carter,* 855 A.2d 885 (Pa. Super. 2004). The court is troubled by the fact that no one spoke for this minor defendant and no one was acting as defendant's interested adult in this matter. Recall his mother actually reported his alleged misconduct. This juvenile defendant had no guardian ad litem nor any attorney to guide him.

Clearly, the duration, the repetition and means of interrogation was in the context of a court-ordered and enforced environment that was triggered by a report of sexual abuse from the only interested adult in the scenario (*i.e.,* the defendant's mother).

Obviously, the physical and psychological state of the defendant was that of a minor who had no interested adult acting on his behalf nor was he fully informed of the legal ramifications of any statements he would make.

Moreover, the conditions attendant to the interrogation were, besides the above factors, a series of interviews purposely manipulated to extract the legal equivalent of a confession from the defendant to statutory mandated reporters.

The attitude of these repeated interviews was that of an interrogation and was really a manipulative series of interviews cloaked in a supposedly "therapeutic" setting but acting in reality as an interrogation, a tool for law enforcement and not therapy.

Therefore, when you look at the totality of the circumstances that existed in this case, we feel it is abundantly clear that the Commonwealth has not proven by a preponderance of the evidence that the defendant's statements given to Kenneth Dady, Karen Choate and Dawn Harer even approached being voluntary.

Ultimately, we are therefore constrained by law to suppress those statements.

An appropriate order will follow.

## ORDER

And now to wit, October 7, 2004, upon directive of the Superior Court memorandum and order dated August 3, 2001, filed to no. 1357 MDA 2000 to apply the "totality of the circumstances" test of *Commonwealth v. Nester,* 551 Pa. 157, 162, 709 A .2d 879, 882 (1998), to the defendant's omnibus motion for the suppression of the statement he gave to Kenneth Dady, Karen Choate and Dawn Harer, and in consideration of the foregoing memorandum, it is hereby ordered and decreed that the Commonwealth has not proven by a preponderance of the evidence that said statements were voluntarily given by the defendant. It is further ordered and decreed that the statements given by the defendant to Kenneth Dady, Karen Choate and Dawn Harer are suppressed.