J-S40009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LANCE PATRICK GREENAWALT, | |
| Appellant | No. 1577 MDA 2013 |

Appeal from the Judgment of Sentence April 16, 2013
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s): CP-21-CR-0000347-2011

BEFORE:  BENDER, P.J.E., BOWES, J., and PANELLA, J.

MEMORANDUM BY BENDER, P.J.E.:               **FILED AUGUST 26, 2014**

Lance Patrick Greenawalt appeals from the judgment of sentence imposed on April 16, 2013, following a jury trial that resulted in his conviction for Criminal Solicitation - Criminal Homicide (two counts), Criminal Attempt - Criminal Homicide, Aggravated Assault (two counts), and Burglary.[1]  The trial court imposed an aggregate sentence of 30 to 70 years' imprisonment.  We affirm.

Appellant raises the following issues on appeal:

1.  Was the evidence at trial sufficient to convict [Appellant] of the crimes of attempted murder, aggravated assault, and burglary?

---

[1] Respectively, 18 Pa.C.S. §§ 902(a), 901(a), 2702(a)(1), and 3502(a).

2.  Was the evidence at trial sufficient to convict [Appellant] of solicitation to commit murder?

3.  Did the trial court err by not severing the solicitation charges from the attempted murder, aggravated assault, and burglary charges?

4.  Did the [c]ourt err by not granting [Appellant's] request for a change in venue for the criminal attempt to commit murder, aggravated assault, and burglary charges, when jurisdiction was proper in Adams County, Pennsylvania?

5.  Did the [c]ourt err by refusing to suppress [Appellant's] recorded statement on the basis that he was denied his Fifth Amendment right against self-incrimination and were those statements made in violation of **Miranda**?[2]

6.  Did the [c]ourt err by refusing to grant [Appellant's] [m]otion *in* [*l*]*imini*[,] which sought to exclude the testimony of T. Bryce, the informant, because Bryce pled guilty in York County, Pennsylvania, to false reports and obstruction of justice for lying that he had been solicited by another to murder a Pennsylvania State Trooper in the hope of receiving favorable treatment for an open charge that he had at that time in York County?

7. Did the [j]udge err by refusing to suppress and/or exclude the involuntary interception of conversations both pretrial and at trial between the informant and [Appellant] because (a) the affidavit of probable cause that formed the basis for the involuntary wiretap arose from an informant who was a tainted and untrustworthy source in that at the time of the application for the wiretap and its issuance, the informant had an open charge for falsifying information concerning a false allegation that he had been solicited to kill a Pennsylvania State Trooper in York County, Pennsylvania; (b) that neither the Application for Oral Communications Intercept nor the Affidavit of Probable Cause attached as "Exhibit A," identified the informant's serious credibility issues about which the Commonwealth was aware that concerned the facts and circumstances surrounding the open false reports and dealing in unlawful activities charge wherein

---

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

the [i]nformant was charged with false statements regarding a different solicitation for murder case, thereby not disclosing that material fact in the document; (c) that neither the [a]pplication for [i]ntercept [o]rder nor the [a]ffidavit of [p]robable [c]ause contained any statement that the intercept was requested and required because of concerns with the [i]nformant's credibility due to his prior criminal record and the open York County false reports charge to which the [i]nformant had not yet pled guilty, and (d) the [o]rder that authorized the wiretap did not sufficiently identify the location of where the wiretap was to be placed?

8. Did the [c]ourt err by refusing to suppress the statement of Appellant?

Appellant's Brief, at 4.

We review Appellant's challenge to the sufficiency of the evidence against him in the following manner:

The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offenses beyond a reasonable doubt.

*Commonwealth v. Mitchell*, 839 A.2d 202, 205 (Pa. 2003) (citing *Commonwealth v. Miller*, 664 A.2d 1310, 1314 (Pa. 1995)). The fact-finder resolves questions of credibility and "is free to believe all, part, or none of the evidence." *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (citing *Commonwealth v. Laird*, 988 A.2d 618, 624 (Pa. 2010)).

We review Appellant's assertions of error regarding the trial court's rulings on his (1) motion for severance; (2) motion to change venue; and

- 3 -

(3) motion *in limine* for an abuse of discretion. ***See Commonwealth v. Dozzo***, 991 A.2d 898, 901 (Pa. Super. 2010) (motion for severance); ***Commonwealth v. Brookins***, 10 A.3d 1251, 1259 (Pa. Super. 2010) (motion to change venue); ***Commonwealth v. Owens***, 929 A.2d 1187, 1190 (Pa. Super. 2007) (motion *in limine*).

Finally, we review the court's denial of Appellant's motions to suppress (1) his recorded statement and (2) the wiretapped conversations between him and Timothy Bryce in the following manner:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts an [*sic*] may reverse only if the legal conclusions drawn therefrom are wrong.

***Commonwealth v. Paxton***, 821 A.2d 594, 598 (Pa. Super. 2003) (quoting ***Commonwealth v. Colon***, 777 A.2d 1097, 1100 (Pa. Super. 2001)); ***see also Commonwealth v. Pruitt***, 951 A.2d 307, 318 (Pa. 2008) (discussing a waiver of ***Miranda*** rights).

We have reviewed the certified record, Appellant's brief, the applicable law, and the comprehensive opinion authored by the Honorable M. L. Ebert, Jr., of the Court of Common Pleas of Cumberland County, entered November 4, 2013. We conclude that Judge Ebert's opinion is dispositive of the issues

presented in this appeal. Accordingly, we adopt the opinion as our own for purposes of further appellate review.[3]

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/26/2014

---

[3] The trial court does not address Appellant's reliance on **Missouri v. Seibert**, 542 U.S. 600 (2004) (plurality). Nevertheless, we note that such reliance is misplaced. **See Commonwealth v. Charleston**, 16 A.3d 505, 525 (Pa. Super. 2011) (rejecting an argument that **Seibert** established binding precedent). Moreover, **Seibert** is inapposite. In that case, a plurality of the United States Supreme Court determined that **Miranda** warnings, intentionally issued mid-interrogation *after* a defendant gave an unwarned confession, were ineffective. **Seibert**, 542 U.S. at 612-14. Here, Appellant received adequate **Miranda** warnings *prior* to giving any inculpatory statement, and there is no indication that the officers who interviewed Appellant sought to withhold appropriate **Miranda** warnings.

COMMONWEALTH

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA

: CP-21-CR-347-2011

V.

: CHARGE: 1. CRIMINAL SOLICITATION
: TO CRIMINAL HOMICIDE (2 COUNTS);
: 2. CRIMINAL ATTEMPT TO
: CRIMINAL HOMICIDE;
: 3. AGGRAVATED ASSAULT;
: 4. BURGLARY

LANCE PATRICK GREENAWALT
OTN: T029948-2

: AFFIANT: TPR. BENJAMIN WILSON

## IN RE: OPINION PURSUANT TO PA. R.A.P. 1925

Ebert, J., November 4, 2013 –

In this criminal case, Defendant appeals his conviction of two counts of Criminal

Solicitation Homicide, Attempted Homicide, Aggravated Assault, and Burglary following

a jury trial held March 18 to March 22, 2013. Specifically, Defendant alleges that:

1. The evidence at trial was not sufficient to convict Defendant of the crimes of attempted murder, aggravated assault, and burglary.

2. The evidence at trial was not sufficient to convict Defendant of solicitation to commit murder.

3. The Trial Court erred by not severing the solicitation charges from the attempted homicide, aggravated assault, and burglary charges.

4. The Trial Court erred by not granting Defendant's request for a change in venue for the criminal attempt to commit homicide, aggravated assault, and burglary charges, where Adams County was the proper forum for the charges and had jurisdiction over those matters.

5. The Trial Court erred by refusing to suppress Defendant's recorded statement on the basis that he was denied his Fifth Amendment right against self-incrimination and where those statements were made in violation of Miranda.

6. The Trial Court erred by refusing to grant Defendant's Motion in Limini [sic] which sought to exclude the testimony of Timothy Bryce, the informant, because Bryce pled guilty in York County, Pennsylvania, to false reports and obstruction of justice for lying that he had been he was [sic] solicited by another to murder a Pennsylvania State Trooper In the hope of receiving favorable treatment for an open charge that he had at that time in York County.

7. The Judge erred by refusing to suppress and/or exclude the involuntary interception of conversations both pretrial and at trial between the informant and Defendant because (a) the affidavit of probable cause that formed the basis for the involuntary wiretap arose from an informant who was a tainted and untrustworthy source in that at the time of the application for the wiretap and at its issuance, the informant had an open charge for falsifying information concerning a false allegation that he had been solicited to kill a Pennsylvania State Trooper in York County, Pennsylvania; (b) that neither the Application for Oral Communications Intercept nor the Affidavit of Probable [Cause] attached as Exhibit "A", identified the informant's serious credibility issues about which the Commonwealth was aware that concerned the facts and circumstances surrounding the open charge false reports and dealing in unlawful activities charge wherein the informant was charged with false statements regarding a different solicitation for murder case, thereby not disclosing that material fact in the document; (c) that neither the Application for the Intercept Order nor the Affidavit of Probable Cause contained any statement that the intercept was requested and required because of the concerns with the Informant's credibility due to his prior criminal record and the open York County false reports charge to which the Informant had not yet pled guilty, and (d) the Order that authorized the wiretap did not sufficiently identify the location of where the wiretap was to be placed.[1]

## Procedural History

The information was filed against Defendant on May 9, 2011. Defendant filed an Omnibus Pretrial Motion on August 2, 2011, which included, a Motion to Suppress the Defendant's Statement, a Motion to Sever Charges and Request Change of Venue, and a Motion to Suppress Auditory Wiretap Surveillance Tapes and Written Transcription of Auditory Surveillance Tapes. A hearing for Defendant's Omnibus Pretrial Motion was held on October 3, 2011. On March 22, 2013, Defendant's Omnibus Pretrial Motion

---

[1] Defendant's Concise Statement of Errors Complained of on Appeal, filed Sept. 27, 2013

2

was granted in part and denied in part. Specifically, the Motion to Suppress Statement of Defendant was denied. The Motion to Sever Charges was granted, which severed one count of Criminal Solicitation Homicide, leaving the two remaining counts. The Defendant's Request for Change in Venue was denied. The Motion to Suppress the Auditory Wiretap Tapes and Transcript was also denied. Defendant filed a Motion in Limine on March 15, 2013, to keep the informant from testifying. This motion was denied.

A jury trial was held between March 18, 2013, and March 22, 2013. The jury found Defendant guilty of all of the above-captioned charges. Following the jury trial, Defendant was sentenced on April 16, 2013. At Count 2, Criminal Attempt to Commit Criminal Homicide, Defendant was sentenced to undergo imprisonment for a period of 19 years to 40 years, running consecutive to any sentence Defendant was serving at the time. The Defendant was further ordered to pay restitution to Daniel Keys in the amount of $13,892.31 and to the Time Insurance Company in the amount of $46,864.10.

At Count 1A, Criminal Solicitation to Commit Criminal Homicide of Daniel Keys, Defendant was sentenced to undergo imprisonment for a period of 10 years to 20 years, running concurrent with Count 2. At Count 1B, Criminal Solicitation to Commit Criminal Homicide of John Lloyd, Defendant was sentenced to undergo imprisonment for a period of 5 years to 10 years to run consecutive to Count 2. Defendant was given a mitigated range sentence on this count because of his service in the United States Army.

3

Count 3A, Aggravated Assault causing serious bodily injury of Daniel Keys, and Count 3B, Aggravated Assault attempting to cause serious bodily injury to Daniel Keys, merged with Count 2 for sentencing purposes.

At Count 4, Burglary, Defendant was sentenced to undergo imprisonment for a period of 6 years to 20 years to run consecutive to Count 1B. This was also a mitigated range sentence because of Defendant's prior service in the United States Army. In total, Defendant's aggregate sentence was 30 years to 70 years imprisonment.[2]

Defendant filed a Post Sentence Motion on April 26, 2013. Defendant's Post Sentence Motion was denied on August 8, 2013. This appeal followed.

## Facts

### I. Background

The relevant facts of this case begin in April 2006 when Daniel Keys (hereinafter "Keys") was attacked as he returned home from dinner. However, before getting into those facts, some background information is necessary concerning the relative parties. Keys has a half-brother, John Lloyd (hereinafter "Lloyd").[3] In April 2006, Lloyd was the beneficiary of Keys' will and stood to inherit a substantial amount of money.[4]

Back in April 2006, Lloyd was living at 491 Cunningham Road (hereinafter "Cunningham Road Property"), outside the Borough of Gettysburg in Freedom Township.[5] Lloyd owned another property located at 4525 Carlisle Road, Dickinson Township, Cumberland County (hereinafter "Mount Holly Property"). Lloyd also owned

---

[2] In Re: Sentencing, April 16, 2013
[3] Notes of Testimony, In Re: Jury Trial, Vol. 1, March 18-19, 2013, 163-64, 220 (hereinafter "N.T. Vol. I, __")
[4] N.T. Vol. I, 183-84
[5] N.T. Vol. I, 219-20

4

a property at 905 Hershey Heights Road in York County (hereinafter "Hershey Heights Property").[6]

Lloyd met Lance Greenawalt (hereinafter "Defendant") in June 2005.[7] Defendant thereafter began working for Lloyd fixing up homes.[8] In addition to working together, Lloyd and Defendant would share personal information with each other.[9] Therefore, Lloyd believed it was very likely he told Defendant that he was the beneficiary of Keys' will.[10] At one point, Lloyd even included Defendant on his will to receive his ashes because he thought it would be too rough on Keys.[11] Problems arose, and Lloyd complained to Keys about Defendant's work and Keys advised Lloyd to fire him.[12] Keys believed that Lloyd told Defendant about Keys' advice to fire him.[13] When Lloyd attempted to fire Defendant, Defendant pulled Lloyd out of a truck and slammed his head into the ground, creating more problems between the two.[14] In 2008, Lloyd was the victim of a theft by deception committed by Defendant.[15] Keys knew of Defendant, but had never met him prior to the 2006 assault.[16]

## II. 2006 Assault

With that background in mind, we now turn to April 30, 2006. At the time, Keys was living at 3535 Old Route 30, Orrtanna, Pennsylvania, Adams County.[17] Keys' residence is located near the intersection of Route 30 and Old Route 30 in Adams

---

[6] N.T. Vol. I, 220
[7] N.T. Vol. I, 225
[8] N.T. Vol. I, 227
[9] N.T. Vol. I, 230
[10] N.T. Vol. I, 230
[11] N.T. Vol. I, 230-31
[12] N.T. Vol. I, 185, 231
[13] N.T. Vol. I, 185
[14] N.T. Vol. I, 232
[15] N.T. Vol. I, 253
[16] N.T. Vol. I, 105, 184
[17] N.T. Vol. I, 160

5

County.[18] On April 30, 2006, Keys went to dinner with Lloyd.[19]. Lloyd picked Keys up at 6:00 p.m. and returned him home around five minutes to 8:00 p.m.[20] After dropping him off, Lloyd returned to his Cunningham Road Property.[21]

After he was dropped off, Keys proceeded to unlock his front doors, first the storm door and then the interior door.[22] After Keys opened the interior door, he "got a glimpse of movement" and a pan of boiling water was thrown in his face.[23] He was then immediately hit with a baseball bat on his head.[24] Keys could not describe the pan used to throw the water, but he did see that the baseball bat was aluminum.[25] He also saw that the assailant shut both front doors and then continued to hit him with the baseball bat.[26]

Keys originally thought there were multiple attackers but then realized it was only one person.[27] He saw a man wearing a hood over his face that hid everything except his eyes.[28] Keys made it to his front door and struggled to get outside as the assailant continued to hit him with the baseball bat.[29] Keys stated he was hit everywhere; "side, front, back, shoulders, neck", but that most of the blows were concentrated on his head and neck area.[30] After he got outside, Keys began yelling for his neighbor, George.[31]

---

[18] N.T. Vol. 1, 40-42
[19] N.T. Vol. 1, 164
[20] N.T. Vol. 1, 164-66
[21] N.T. Vol. 1, 219-20, 222
[22] N.T. Vol. 1, 166-67
[23] N.T. Vol. 1, 167
[24] N.T. Vol. 1, 167
[25] N.T. Vol. 1, 169
[26] N.T. Vol. 1, 167
[27] N.T. Vol. 1, 167
[28] N.T. Vol. 1, 168
[29] N.T. Vol. 1, 170-71
[30] N.T. Vol. 1, 170-71
[31] N.T. Vol. 1, 171

Then the assailant had Keys down on the ground as he stood above him and hit him on the head with the bat, knocking Keys unconscious.[32]

After Keys woke up, he could not see, but he was able to locate his cell phone and feel the buttons to dial 9-1-1.[33] Trooper David J. Rush was on his way home from work when he responded to the dispatch.[34] After Trooper Rush arrived, he saw Keys lying on the ground in a pool of blood.[35] Trooper Rush contacted the State Police at Gettysburg and had an ambulance sent for Keys.[36]

While waiting for the ambulance, Trooper Rush noticed open lacerations on the top of Key's head and "blood all over his face, his clothes and his hands".[37] Keys was able to tell Trooper Rush his name, and that he had been attacked by people with baseball bats.[38] He also provided Trooper Rush with details about the assault, but he was not able to say who the assailant was or how many assailants there were.[39] Keys also asked if Trooper Rush could call his brother, Lloyd.[40]

A helicopter arrived to transport Keys to York for treatment.[41] After receiving the phone call from Trooper Rush, Lloyd went to see Keys in the hospital where he appeared "very badly beaten."[42] In fact, Keys had three broken fingers on both hands as well as broken wrist and hand bones.[43] Dr. Suzette Song treated Keys for the

---

[32] N.T. Vol. I, 172-73
[33] N.T. Vol. I, 173; Com. Ex. 37
[34] N.T. Vol. I, 40
[35] N.T. Vol. I, 46
[36] N.T. Vol. I, 47
[37] N.T. Vol. I, 48
[38] N.T. Vol. I, 47
[39] N.T. Vol. I, 50
[40] N.T. Vol. I, 50
[41] N.T. Vol. I, 177
[42] N.T. Vol. I, 223
[43] N.T. Vol. I, 178; Com. Ex. 41

7

injuries to his hands.[44] He required surgical intervention for the broken wrist bone.[45] Keys' broken hand bones healed normally and as expected.[46] Dr. Song was able to state to a reasonable degree of medical certainty that the injuries to Keys' hand could have been the result of being hit with a baseball bat.[47] Keys also needed 103 stitches in his head and had severe headaches for months.[48] Keys stated he has had problems with his memory since the assault.[49]

Additionally, Keys' eyes were harmed from the boiling water thrown in his face. He stated that for months after the incident he had blurred vision.[50] Through a stipulated letter, Christianne Schoedel, M.D., who saw Keys for his eye injuries, indicated that Keys' eye movement was completely normal and he had no loss of vision in any area.[51] Keys' had minor defects on the surface of his left eye and received antibiotic drops.[52] Keys' did not make a follow-up appointment with her.[53]

After Lloyd saw Keys at the hospital on April 30, 2006, he left and called Defendant.[54] Lloyd wanted to know where Defendant was because he had suspicions that he might have been involved in the attack.[55] Lloyd believed that he may have told Defendant that he was going to dinner with Keys the night of April 30, 2006.[56]

---

[44] N.T. Vol. I, 26
[45] N.T. Vol. I, 26
[46] N.T. Vol. I, 28, 179
[47] N.T. Vol. I, 29
[48] N.T. Vol. I, 178-79
[49] N.T. Vol. I, 179
[50] N.T. Vol. I, 179
[51] N.T. Vol. I, 273-75; Com. Ex. 42
[52] N.T. Vol. I, 274; Com. Ex. 42
[53] N.T. Vol. I, 275; Com. Ex. 42
[54] N.T. Vol. I, 232
[55] N.T. Vol. I, 233
[56] N.T. Vol. I, 235-36

Defendant was at the Hershey Heights Property, and Lloyd met him there and confronted him.[57] Defendant appeared normal to Lloyd and denied any involvement.[58]

### III. Investigation Following 2006 Assault

On the night of the assault, Trooper Benjamin Wilson arrived at the Keys' residence scene.[59] Trooper Rush and Trooper Wilson were able to locate the point of entry as a window at the back of the house. The screen was removed and there was a footprint on the air conditioning unit directly underneath the window.[60] Trooper Rush determined the sliding glass door in the back of the house, which was unlocked, was the assailant's exit point that night.[61]

In the front yard, they saw a pool of blood and Keys' vomit from when he was knocked unconscious.[62] Trooper Rush indicated that someone would have to have been injured pretty severely to leave that much blood on the ground.[63] Inside the house, Trooper Rush noticed water on the floor near the front door and on the inside of the front door, consistent with the fact that Keys was hit in the face with boiling water.[64] Blood smears were also found inside the house near the front door.[65] Corporal Matthew Frampton processed the scene for fingerprints.[66] He was unable to find any latent fingerprints within the residence.[67]

---

[57] N.T. Vol. I, 233-34
[58] N.T. Vol. I, 234
[59] N.T. Vol. I, 52
[60] N.T. Vol. I, 55-56; Com. Ex. 9
[61] N.T. Vol. I, 79-80
[62] N.T. Vol. I, 61; Com. Ex. 15
[63] N.T. Vol. I, 63
[64] N.T. Vol. I, 65-66; Com. Ex. 18
[65] N.T. Vol. I, 68; Com. Ex. 21, 22, 23
[66] N.T. Vol. I, 138
[67] N.T. Vol. I, 142

Trooper Rush interviewed Keys neighbor, George Nas (hereinafter Nas), who lives across the street from Keys.[68] On the night of the assault, Nas heard Keys scream.[69] As he looked across the street, he saw legs going back and forth under the branches of the trees and eventually saw that the legs were headed east.[70] He was unable to tell how many people he saw.[71] Deborah Carr who owns the Pines Candle Gallery store, located next to Keys' property, was also interviewed.[72] She is familiar with Defendant because he came into her store approximately six times.[73] All the times Defendant came into her store were before Keys was attacked.[74]

Trooper Rush also talked with Keys within a few days of the incident. Keys was able to describe the attacker as having a medium build, approximately 5'9" or 5'10", and that he could not see his face because he was wearing a gray knit cap pulled over it with just eyeholes cutout.[75] At a third interview, Keys was able to remember that the assailant had light-colored eyebrows.[76] Keys also indicated that he could see eye-to-eye with the attacker.[77]

Through his investigation, Trooper Rush determined that Defendant was a person of interest, but he was not designated an official suspect on the investigation form.[78] Trooper Rush knew that Lloyd employed Defendant fixing up homes, but he

---

[68] N.T. Vol. I, 80, 260
[69] N.T. Vol. I, 261
[70] N.T. Vol. I, 261
[71] N.T. Vol. I, 262-63
[72] N.T. Vol. I, 254-55
[73] N.T. Vol. I, 255
[74] N.T. Vol. I, 256
[75] N.T. Vol. I, 77
[76] N.T. Vol. I, 78
[77] N.T. Vol. I, 95
[78] N.T. Vol. I, 88, 108

was unable to establish a relationship directly between Defendant and Keys.[79] Trooper Rush decided to interview Defendant sometime around June 2006.[80] Defendant came voluntarily to the State Police barracks in Gettysburg for the interview.[81] Defendant was not read his Miranda warnings because he was not under arrest and was informed he was free to go.[82] Although Trooper Rush told Defendant that he wanted to talk to him about an assault on Keys, he provided no details about the investigation to Defendant.[83] Defendant stated that he had never met Keys but had heard of him through Lloyd.[84] Defendant asked Trooper Rush if he thought the people who attacked Keys were trying to kill him.[85] This was odd to Trooper Rush, since Defendant acted like he had no interest in Keys throughout the interview.[86] Trooper Rush noted that Defendant is 5'8" tall, while Keys is 5'7".[87]

Trooper Rush determined that the attack on Keys was planned.[88] The fact that boiling water was thrown in Keys' face indicated that the assailant must have had some idea of when Keys was returning home that evening.[89] Additionally, nothing was taken from the residence or from Keys' person, including his wallet.[90] However, despite the thorough investigation by all the officers involved, this case remained unsolved.

---

[79] N.T. Vol. I, 88
[80] N.T. Vol. I, 89
[81] N.T. Vol. I, 90-91
[82] N.T. Vol. I, 90
[83] N.T. Vol. I, 93-94
[84] N.T. Vol. I, 90
[85] N.T. Vol. I, 91
[86] N.T. Vol. I, 91
[87] N.T. Vol. I, 95
[88] N.T. Vol. I, 132
[89] N.T. Vol. I, 132
[90] N.T. Vol. I, 132

## IV. 2010 Solicitations

Sometime in late July or early August 2010, the informant, Timothy Bryce, (hereinafter "Bryce"), who also goes by Jack, met Defendant while they were both incarcerated at SCI Camp Hill.[91] Bryce has an extensive criminal history, including: (1) a 2004 conviction in Maryland for impersonation of a person in uniform, (2) a 2005 conviction in Maryland for impersonating a police officer, (3) two misdemeanor convictions for theft from Maryland in 2006, (4) a 2010 felony conviction for retail theft in Pennsylvania, (5) a felony conviction for possession/selling a stolen vehicle from South Carolina in 2011, (6) a 2011 conviction for larceny of a vehicle in North Carolina, (7) a 2012 felony conviction for larceny of a vehicle in North Carolina, (8) two misdemeanor larceny convictions from North Carolina in 2012, and (9) three 2012 misdemeanor convictions from York, Pennsylvania of unsworn falsification, false reports to law officials, and obstructing administration of law (hereinafter "York Incident").[92]

Bryce previously informed on fellow inmates. In 2007, Bryce informed on an individual in Maryland which resulted in a charge and a conviction of that individual.[93] Bryce also attempted to inform on an individual in South Carolina that resulted in the charges against that individual being *nol prossed*.[94] The York Incident occurred in 2010, when Bryce offered to provide information in exchange for favorable treatment in a pending retail theft case about an individual who wanted a state trooper killed.[95]

---

[91] Notes of Testimony, In Re: Jury Trial, Vol. II, March 20, 2013, 278, 281 (hereinafter "N.T. Vol. II, ___")
[92] N.T. Vol. II, 293-94
[93] N.T. Vol. II, 295
[94] N.T. Vol. II, 295-96; Com. Ex. 63
[95] N.T. Vol. II, 297

12

Bryce fabricated details and eventually ended up pleading guilty to the three 2012 Pennsylvania charges listed *supra*.[96]

After meeting in 2010, Bryce and Defendant developed a friendship and became cell mates.[97] Defendant began to tell Bryce how he committed the 2006 assault on Keys. Defendant provided Bryce with many details about the assault.[98] Defendant also solicited Bryce to kill both Keys and Lloyd for him.[99] Bryce informed the authorities and eventually spoke with Trooper Wilson and Trooper Pugh on September 7, 2010.[100] Bryce provided specific details of what Defendant told him through both interviews and letters he wrote to Trooper Wilson and Captain Leggore.[101]

Bryce also provided Trooper Wilson with maps that Defendant drew.[102] Defendant admitted at trial to drawing the maps of Keys' home, Lloyd's Cunningham Road Property, and Lloyd's Mount Holly Property.[103] These maps were incredibly detailed and included road names, landmarks, and floor plans of the homes.[104] Bryce indicated that Defendant wanted him to be as familiar with the areas as possible in order to pull off the hits.[105] Corporal Frampton processed the maps for fingerprints.[106] He was able to find a few prints on the four maps he was given to process.[107] All of the prints found belonged to Bryce.[108]

---

[96] N.T. Vol. II, 297-98
[97] N.T. Vol. II, 282
[98] N.T. Vol. II, 283
[99] N.T. Vol. II, 283
[100] N.T. Vol. II, 284-85
[101] N.T. Vol. II, 284-89; Com. Ex. 50, 51, 52, 54, 55, 56
[102] N.T. Vol. II, 289-91
[103] N.T. Vol. III, 533-34, 542; Com. Ex. 43,44,45
[104] Com Ex. 43, 44, 45
[105] N.T. Vol. II, 291
[106] N.T. Vol. I, 142
[107] N.T. Vol. I, 144-51; Com. Ex. 43, 44, 45, 46
[108] N.T. Vol. II, 385; Com. Ex. 67

During the initial September 7, 2010, interview, Bryce told Trooper Wilson what Defendant told him of the assault he committed in 2006.[109] As Bryce relayed details of the assault, Trooper Wilson immediately remembered the 2006 assault on Keys because he was one of the officers who responded to that assault.[110] Therefore, Trooper Wilson was able to immediately corroborate some of the details that Bryce was telling him.[111] Trooper Wilson immediately called Adams County District Attorney, Shawn Wagner, who confirmed more details.[112] Bryce also told Trooper Wilson that Defendant asked him to murder Keys and Lloyd for him.[113] Trooper Wilson remembered both names from the 2006 assault.[114]

After meeting with Trooper Wilson a couple times, Bryce asked to have a body wire so Trooper Wilson could hear what Defendant was saying.[115] However, Bryce was never provided a body wire because of the risky nature of pulling that off in the prison setting, where inmates could be searched many times a day.[116] Eventually, Trooper Wilson received permission to place a wiretap into Defendant's cell.[117] Mervin R. Rodriguez, an information technology specialist with the FBI, secreted the recording device into the cell Defendant and Bryce shared.[118]

The wiretap was placed in the cell on September 21, 2010, around midday.[119] Bryce was not told at first that the wiretap was recording but, at some point, he was

---

[109] N.T. Vol. II, 361
[110] N.T. Vol. II, 361
[111] N.T. Vol. II, 361
[112] N.T. Vol. II, 362-63
[113] N.T. Vol. II, 360, 362
[114] N.T. Vol. II, 362
[115] N.T. Vol. II, 303
[116] N.T. Vol II, 303-04, 371
[117] N.T. Vol. II, 373; Com. Ex. 68
[118] N.T. Vol. II, 343-44
[119] N.T. Vol. II, 376

14

made aware of the recording because he was getting very upset that nothing had been done.[120] Trooper Wilson did not tell Bryce what to say on the recording but instructs him to talk about things as normal.[121] After the wiretap was concluded, DVDs of the conversations were made and Bryce was able to identify the voices on the wiretap as Defendant and himself.[122] Defendant also admits that it is his voice on the wiretap recording.[123] Bryce was moved out of SCI Camp Hill after the conclusion of the wiretap.[124]

On the wiretap, Defendant describes in detail the 2006 assault he committed on Keys.[125] Defendant indicated he performed the assault with his ex-SF guys.[126] While the Defendant did in fact begin the Special Forces (SF) training course in the Army, he did not graduate from the Special Forces course.[127] Defendant instructs Bryce on how to kill Keys.[128] Defendant describes the layout of Keys' house and Keys' usual routine.[129] Defendant also describes the layout of Lloyd's Mount Holly property and how Bryce should kill Lloyd.[130] Defendant tells Bryce he will give him a Harley Davison motorcycle for killing Keys and Lloyd for him.[131]

After Bryce is moved from SCI Camp Hill, Defendant wrote a letter to the security office accusing Bryce of taking some of Defendant's documents, including maps of his

---

[120] N.T. Vol. II, 304, 379, 382
[121] N.T. Vol. II, 382
[122] N.T. Vol. II, 304-05; Com. Ex. 65, 66
[123] N.T. Vol. III, 531-32
[124] N.T. Vol. II, 307
[125] Com. Ex. 66, 65
[126] Notes of Testimony, In Re: Jury Trial, Vol. III, March 21-22, 2013, 411 (hereinafter "N.T. Vol. III, ___"); Com. Ex. 66, 65
[127] N.T. Vol. III, 411-14; Com. Ex. 72
[128] Com. Ex. 66, 65
[129] N.T. Vol. II, 394; Com. Ex. 66
[130] N.T. Vol. III, 415; Com. Ex. 66, 65
[131] N.T. Vol. III, 555; Com. Ex. 66, 65

15

hometown, and how he is worried about the safety of his girlfriend and new baby.[132] This letter provided the reason for Trooper Wilson to initiate an interview with Defendant.

This interview of Defendant consisted of three parts.[133] Before each part of the interview, Trooper Wilson and Trooper Denisch inform Defendant that he was not under arrest, he did not have to talk to them, and he can leave the room or stop the interview whenever he wants.[134] Defendant also signed a rights waiver form, which clearly explained his Miranda warnings.[135] The first part consisted of responding to the letter Defendant wrote.[136] Defendant denies drawing any maps at this time.[137] In the second segment, Trooper Wilson tells Defendant that he already looked into the report and talked to Bryce and that Bryce made serious accusations against him.[138] Defendant denies making any statements or asking Bryce to kill anyone for him.[139] During the third segment, Trooper Wilson confronts Defendant with the wiretap recordings and Defendant admits that he might have made some statements, but it was "stupid ass jailhouse talk."[140]

Defendant stated that the conversations he had with Bryce went both ways, with Bryce asking Defendant to whack people too.[141] Defendant described his tone when discussing these things with Bryce to be "filled with vengeance, anger" and that the

---

[132] N.T. Vol. III, 423-25; Com. Ex. 53
[133] N.T. Vol. III, 426, 428; Com. Ex. 74
[134] N.T. Vol. III, 427-28, 435; Com. Ex. 73
[135] N.T. Vol. III, 427-28; Com. Ex. 73
[136] N.T. Vol. III, 426
[137] N.T. Vol. III, 433-34
[138] N.T. Vol. III, 427
[139] N.T. Vol. III, 427, 435-36
[140] N.T. Vol. III, 439-40
[141] N.T. Vol. III, 523

16

conversations were a "stupid way to vent aggression".[142] Defendant further stated that Bryce was the one that began conversations with him about the 2006 assault and asked him questions pertaining to details Bryce must have learned from speaking with Glen Toney, another inmate who also used to work for Lloyd.[143] Defendant maintained that he knew nothing would actually happen and that Bryce was not a killer.[144]

## Discussion

Before beginning a detailed analysis of the Defendant's issues, it should be noted that some issues discussed below, namely: II. Severing Charges; III. Change of Venue, IV. Suppression of Defendant's Statement and VI. Suppression of Wiretap Conversation were previously addressed in this Court's twenty page omnibus pretrial motion opinion which was filed on March 22, 2012. That opinion is incorporated by reference at Appendix A of this opinion.

### I. Sufficiency of Evidence

In his first two matters complained of, Defendant argues that the evidence at trial was not sufficient to convict or sustain a conviction for the above captioned charges.

### A. Legal Standard

"The standard of reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offense beyond a reasonable doubt." Commonwealth v. Strouse, 909 A.2d 368, 368-69 (Pa. Super. 2006). This standard applies equally to cases based on either direct or circumstantial evidence, as long as "the combination of

---

[142] N.T. Vol. III, 525
[143] N.T. Vol. III, 532
[144] N.T. Vol. III, 556

17

the evidence links the accused to the crime beyond a reasonable doubt." Commonwealth v. Parker, 847 A.2d 745, 750 (Pa. Super. 2004), quoting Commonwealth v. Coon, 695 A.2d 794, 797 (Pa. Super. 1997)(citations omitted). In proving its case, the Commonwealth "need not establish guilt to a mathematical certainty". Id. at 750.

The jury, as the trier of fact, has "the responsibility of assessing the credibility of the witnesses and weighing the evidence presented". Commonwealth v. Newton, 994 A.2d 1127,1131 (Pa. Super. 2010), quoting Commonwealth v. Pruitt, 951 A.2d 307, 313 (Pa. 2008)(citations omitted). The jury is "free to believe all, part or none of the evidence". Id. Therefore, the reviewing court "may not substitute its judgment for that of the [jury]; if the record contains support for the convictions they may not be disturbed." Parker, 847 A.2d at 750.

### B. Attempted Homicide

To sustain a conviction for attempted homicide, the Commonwealth must prove that a defendant, with a specific intent to kill, took a substantial step towards that goal. Commonwealth v. Robertson, 874 A.2d 1200, 1207 (Pa. Super. 2005). A specific intent to kill can be inferred from the circumstances, including the fact that the defendant used a deadly weapon to inflict injury to a vital part of the victim's body. Id. at 1207.

Deadly weapon is defined as "[a]ny firearm...or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury". 18 Pa.C.S.A. § 2301. Items not normally considered deadly weapons can become deadly given the circumstances. Commonwealth v. Rhoades, 8 A.3d 912, 917 (Pa. Super. 2010). A

18

baseball bat can certainly be a deadly weapon when used on the head or other vital part of the body and is sufficient to establish a specific intent to kill. Commonwealth v. Nichols, 692 A.2d 181, 184 (Pa. Super. 1997).

In this case, there was evidence that Keys was repeatedly hit with a baseball bat on his head and neck area, knocking him unconscious. Keys required over 100 stiches on his head from the injuries. He also required surgery on his hand. There was clearly sufficient evidence that a deadly weapon was used on a vital part of Keys' body for the jury to conclude Defendant had a specific intent to kill Keys.

Additionally, Defendant is heard on the wiretap recording describing how he committed the 2006 assault on Keys in extreme detail. The Defendant and Bryce had one such conversation concerning Keys:

> *Defendant:* Listen man, I – I can't imagine a human being getting fucking beaten like that – I'm serious.
>
> *Bryce:* Well, these bats were small.
>
> *Defendant:* They were small but I'm telling you, man, I was swinging that fucking (unintelligible). Beatin' him in the fuckin' head, (unintelligible). 15 times in the fuckin' head. As hard as I could (unintelligible). He beat this fuckin' (unintelligible).
>
> *Bryce:* Geez.
>
> *Defendant:* I hit him – I hit him right here the first time – as hard as I could fucking swing at him, it went boom. I'm serious.[145]

During another conversation with Bryce, Defendant stated:

> I'm telling you, I've never seen anybody take a beating (unintelligible) like Keys. That's no shit, man, that's no shit. I mean we beat him up so bad (unintelligible). We did. And boiling water hit him in the face, he went down like a ton of bricks, man, I thought that shit killed him.[146]

---

[145] N.T. Vol. II. 390-91; Com. Ex. 66
[146] N.T. Vol. II. 393; Com. Ex. 66

19

In yet another discussion between Defendant and Bryce about the attack on Keys, Defendant states:

> ...Arm broken in three places, big rod through his arm. Man, it's – there is no way I can believe that I wouldn't have been there that this man took a beating like that and lived through it. For real. I mean Jack. You should have seen how hard we were beating this dude man. My – I was beating him until my arm got tired...[147]

Defendant also divulged details of the incident that would only have been known by someone who was present, including: the fact that the neighbor was out across the street, that Keys' screamed when he made it outside, and that the helicopter came for Keys that night.[148] Defendant also told Bryce that he did not speak during the attack and that he wore a baklava and gloves during the attack.[149] There was clearly evidence sufficient for the jury to find that Defendant was not only present during the attack, but he performed the attack in an attempt to kill Keys. Therefore, there was more than sufficient evidence that Defendant committed attempted homicide of Keys in 2006 beyond a reasonable doubt.

### C. Aggravated Assault

A defendant is guilty of Aggravated Assault if he either attempts to cause serious bodily injury or actually causes serious bodily injury intentionally or knowingly. 18 Pa.C.S.A. § 2702(a)(1); see also Commonwealth v. Holley, 945 A.2d 241, 247 (Pa. Super. 2008). Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or

---

[147] N.T. Vol. II, 397; Com. Ex. 66
[148] N.T. Vol. II, 393, 397; N.T. Vol. III, 409; Com. Ex. 66, 65
[149] N.T. Vol. II, 393, 397; N.T. Vol. III, 409 Com. Ex. 66, 65

20

protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301; Holley, 945 A.2d at 247.

In this case, boiling water was thrown in Keys' face and he was knocked unconscious from baseball bat blows to his head and neck. Keys had to be rushed to the hospital by helicopter after the attack. Keys required surgery on his hand and over 100 stiches to his head.

As discussed *supra*, Defendant is heard describing how he committed the 2006 incident. Therefore, there was sufficient evidence for the jury to conclude that Defendant either caused or attempted to cause serious bodily injury to Keys beyond a reasonable doubt.

### D. Burglary

In order to prove burglary, the Commonwealth must show that a defendant entered a building or occupied structure with the intent to commit a crime therein, unless the defendant was licensed or privileged to enter. 18 Pa.C.S.A. § 3502; *see also* Commonwealth v. Lambert, 795 A.2d 1010, 1022 (Pa. Super. 2002). The intent to commit a crime after entry may be inferred from the circumstances. Lambert, 795 A.2d at 1022.

In this case, there was evidence that Defendant removed the screen from a rear window and entered Keys' home when Keys was out to dinner, with the intent to harm him when he returned. Investigating officers found a footprint on the air conditioning unit directly underneath the rear window. As further proof that Defendant was at Keys' house on April 30, 2006, the following conversation took place between Defendant and Bryce:

21

*Bryce [discussing murdering Keys]:* So if that mean – that's how I was thinking at first, like I'm trying to memorize every detail 'cause I was gonna recreate the whole thing exactly like it was done the first time, I mean to the point where I was gonna step on the fucking AC unit and – 'cause you said it was gray and the paint chipped off...

*Defendant:* One chipped off, it was like from the sun, you know when paint...[150]

There was sufficient evidence for the jury to determine that Defendant was at Keys' house on April 30, 2006, and committed burglary when he stepped on the air conditioner, removed the screen, and entered Keys' home through the window.

Defendant entered Keys' home armed with a baseball bat. He additionally boiled water and threw it in Keys' face when he arrived home and proceeded to beat Keys. This evidence was more than sufficient for the jury to conclude that Defendant entered Keys' home with the intent to kill and/or assault him beyond a reasonable doubt.

### E. Criminal Solicitation - Homicide

For Criminal Solicitation – Homicide – the Commonwealth must establish that a defendant (1) encouraged another person to engage in specific conduct, (2) with the intent of promoting or facilitating the commission of the crime of Criminal Homicide, and (3) the conduct that was encouraged or requested by the defendant would either constitute Criminal Homicide or an attempt to commit Criminal Homicide. 18 Pa.C.S.A. § 902(a). Criminal Homicide consists of an intentional killing. 18 Pa.C.S.A. § 2502(a). In this case Defendant was charged with two counts of Criminal Solicitation – Homicide for both Keys and Lloyd.

---

[150] N.T. Vol. II, 389-90; Com. Ex. 66

22

Bryce testified that Defendant asked him to kill both Keys and Lloyd for him. Bryce further testified that Defendant drew maps of both Keys' and Lloyd's homes for him so that he would be familiar enough with the area to carry out the murders.

One of the many conversations between Defendant and Bryce about killing Keys is as follows:

...

*Defendant:* Because that's what I – that's what I would have done Keys with.

*Bryce:* Okay. But why? I mean is there any – any particular reason?

*Defendant:* Because if you're inside that building, nobody is ever going to hear a .380. You know what I'm saying?

...

*Bryce:* I like your – I like your latest plan the best. Cut a hole in that sliding glass door.

*Defendant:* Yeah. And wait for him.

...

*Bryce:* You know, just lie in wait for him. Because if he goes to that post office box every day in like McKnightstown, that's – that's telling me that all I have to do is wait long enough from the morning, he'll go out to his post office box, right? Monday through probably Saturday.

*Defendant:* Guaranteed. I don't know about Saturdays    Saturday – weekends is fluctuating because he goes to antique shit.[151]

Defendant then instructs Bryce to trash Keys' home after he kills him and to take his wallet and cell phone to Washington D.C. to dispose of them.[152]

On the wiretap recordings, Bryce asks Defendant to refresh a couple of details about killing Lloyd.[153] Defendant begins by describing the area surrounding Lloyd's

---

[151] N.T. Vol. II, 397; Com. Ex. 65
[152] N.T. Vol. III, 409; Com. Ex. 65
[153] N.T. Vol. III, 415; Com. Ex. 65

23

Mount Holly Property and how Bryce can find that property in extreme detail.[154]

Defendant then continues to tell Bryce how to accomplish killing Lloyd:

> *Defendant:* Um, if you want to go into the house you go down on -- come around on the left side and there'll still be Mountain Laurel and there will be a tunnel going down into his basement, a stone tunnel. Okay? It's only as long as this cell. Just a little higher than your head.
>
> *Bryce:* Right.
>
> *Defendant:* And it goes down. And Lloyd was using it. It was unlocked every time I was down there.
> ...
>
> *Defendant:* Well all the electric and everything is down in the basement.
>
> *Bryce:* Cut his electric?
>
> *Defendant:* Just flip it off at the switch. I mean he has to come down in the basement.
> ...
>
> *Defendant:* And there's a room right at the bottom of the stairs that -- I mean you could be around the corner. Yeah. I mean if you do that in a storm, just kick the breaker when he's home, he has to come down. That would be perfect.[155]

Defendant further instructs Bryce in how to conceal Lloyd's body and tells Bryce:

> You're in a stone basement. No you could fire a cannon in that bitch and nobody would hear it. If you were in a stone basement on 12 acres -- if you were in a stone basement on 12 acres -- and I'd even drag him back in this room right here because then nobody could see him from anywhere. You know?[156]

In the conversation about killing Lloyd, Defendant also tells Bryce that, "I think as long as I have a solid alibi, it wouldn't matter what happened to Lloyd."[157]

---

[154] N.T. Vol. III, 415; Com. Ex. 65
[155] N.T. Vol. III. 415; Com. Ex. 65
[156] N.T. Vol. III. 415; Com. Ex. 65
[157] N.T. Vol. III. 415; Com. Ex. 65

24

Circulated 07/31/2014 01:55 PM

Defendant and Bryce also discuss procuring guns for the murders of Keys and Lloyd in detail, including an elaborate plan to purchase the guns at McDonalds to ensure it was not a set-up.[158] Defendant also encourages Bryce by offering to give him a motorcycle for helping him murder Keys and Lloyd.[159]

While Defendant testified at trial that this was just a way to vent aggression and he knew that Bryce would never murder anyone, the jury was free to assess Defendant's credibility and disbelieve his testimony. The jury heard Defendant on the wiretap recordings say things to indicate his solicitation to murder Keys and Lloyd was not just a stupid way to vent aggression, but a well thought out plan he believed he could get away with. Defendant told Bryce, "Not that they – if I'm in jail they're not – they're certainly not going to come point the finger at me. I'm – I'm not going to say a word because that's, you know, this is my ass".[160] Defendant also tells Bryce that he would be forever indebted to him for helping him out.[161]

There were other conversations between Defendant and Bryce from which the jury could infer that Defendant was serious about this plan, such as:

> *Bryce:* So you – you have faith that I can do this and actually get away with it?
>
> *Defendant:* Oh, we wouldn't be talking about it if I didn't.[162]

After discussing the murders of Keys and Lloyd at length, Defendant tells Bryce:

> *Defendant:* We had a good planning session, strategy session.
>
> *Bryce:* Say again?

---

[158] N.T. Vol. II. 394; Com. Ex. 66
[159] N.T. Vol. II. 393; Com. Ex. 66
[160] N.T. Vol. II, 396; Com. Ex. 65
[161] N.T. Vol. III. 416; Com. Ex. 65
[162] N.T. Vol. II. 401; Com. Ex. 65

25

*Defendant:* I said that was a good strategy session.[163]

Based upon Defendant's own statements made to Bryce while in prison, there was more than sufficient evidence for the jury to determine beyond a reasonable doubt that Defendant solicited Bryce to murder both Keys and Lloyd and that he was serious about it.

### II. Severing Charges

Defendant next complains that this Court erred by not severing the Solicitation charges from the other charges.[164] This Court disagrees. A trial court has discretion when addressing a motion for severance and "its decision will not be disturbed absent a manifest abuse of discretion". Commonwealth v. Dozzo, 991 A.2d 898, 901 (Pa. Super. 2010)(internal citations omitted). The appellant bears the burden of establishing that he was prejudiced by the decision not to sever. Id. at 901.

Under Pennsylvania Rules of Criminal Procedure 583, a court may order separate trials of offenses if it appears that any party may be prejudiced by offenses being tried together. Pa.R.Crim.P. 583. This prejudice "must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." Id. at 902.

The Pennsylvania Supreme Court has established the following test for severance matters:

> Where the defendant moves to sever offenses not based on the same act or transaction...the court must therefore determine: (1) whether the evidence of each of the offenses would be admissible in a separate trial for the other; (2) whether such evidence is capable of separation by the

---

[163] N.T. Vol. III. 416; Com. Ex. 65

[164] It should be noted that this Court did sever one of the solicitation charges against Defendant, because it could have been prejudicial to Defendant and was not as connected to the charges stemming from 2006 as the two remaining solicitation charges.

jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, (3) whether the defendant will be unduly prejudiced by the consolidation of offenses.

Id. at 902 (quoting Commonwealth v. Lark, 543 A.2d 491, 496-97, (Pa. 1988)).

Looking at the first prong of the test, evidence of other crimes is admissible to show:

(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) the identity of the person charged with the commission of the crime on trial. Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts.

Id. at 902 (internal citations omitted); see also Pa.R.E. 404(b)(2).

In this matter, it is clear that the Attempted Homicide, Aggravated Assault, and Burglary charges stemming from 2006 form part of the history of the case. The evidence linking Defendant to the 2006 assault on Keys is necessary to develop how Defendant was connected to Keys and why Defendant wanted Keys dead. Since Lloyd is Keys' half-brother and Defendant worked for Lloyd back in 2006, there is clearly a connection between the solicitation to kill Lloyd and the 2006 assault.

Turning to the second prong, a jury is capable of separating evidence when the offenses are distinguishable in time and location. Id. at 903. This is certainly true in this matter where the solicitation took place four years after the other charges. Based on the determination made for the first two prongs, there is no need to consider the third prong. Defendant has not demonstrated that he was prejudiced by not having the Solicitation charges severed. This Court did not err by not severing the Solicitation charges from the Attempted Homicide, Aggravated Assault, and Burglary charges.

27

Circulated 07/31/2014 01:55 PM

## *III. Change in Venue*

Defendant next complains that this Court erred in not granting Defendant's request for a change in venue for the Attempted Homicide, Aggravated Assault, and Burglary charges because Adams County was the proper forum for those charges. The decision to deny a motion for change of venue is within the sound discretion of the trial court, and will not be disturbed absent an abuse of discretion. Commonwealth v. Brookins, 10 A.3d 1251, 1258 (Pa. Super. 2010)(internal citations omitted).

Venue relates to the right of a party to have a controversy brought in a particular judicial district. Commonwealth v. Bethea, 828 A.2d 1066, 1074 (Pa. 2003). Even though each court of common pleas possesses subject matter jurisdiction for cases arising under the Pennsylvania Crimes Code, venue generally begins in the court with a geographic connection to the events at issue. Id. at 1075. Venue may be changed "when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending". Brookins, 10 A.3d at 1259; Pa.R.Crim.P. 584(A). When evaluating the likelihood of prejudice, the court should consider whether the venue caused defendant to incur undue expense, whether the defendant was unable to obtain the presence of witnesses or evidence, whether the Commonwealth engaged in forum shopping to obtain an advantage, and whether pre-trial publicity rendered a fair trial unlikely. Bookins, 10 A.3d at 1259. The moving party, Defendant in this case, bears the burden of showing that a change in venue is necessary. Brookins, 10 A.3d at 1259.

There is no evidence that the Defendant was prejudiced by this Court's decision not to change venue to Adams County. Defendant did not incur any undue expenses.

28

Defendant was able to procure witnesses to testify at trial, most of whom were located in Cumberland County. There was no evidence that the Commonwealth engaged in forum shopping as Cumberland County and Adams County are relatively similar and are within 28 miles of each other. The evidence against Defendant for both the 2006 charges and the Solicitations was obtained through the wiretap conducted in Cumberland County. Furthermore, there is no evidence that Defendant was prejudiced by pre-trial publicity. In fact, there would likely be more unfavorable pre-trial publicity concerning the charges stemming from 2006 in Adams County, where the crimes occurred. This Court did not err in failing to change venue to Adams County.

### IV. Suppression of Defendant's Statement

Next, Defendant argues that this Court erred by refusing to suppress Defendant's recorded statement because Defendant was denied his Fifth Amendment right against self-incrimination and the statement was made in violation of Miranda. This Court disagrees. The standard of review for denial of a suppression motion is as follows:

> [The] standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. When reviewing rulings of a suppression court, [the appellate court] must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, [the appellate court is] bound by those facts an [sic] may reverse only if the legal conclusions drawn therefrom are wrong.

Commonwealth v. Paxton, 821 A.2d 594, 598 (Pa. Super. 2003)(internal citations omitted).

Miranda warnings are required when the suspect is subject to a custodial interrogation. Id. at 598. For a waiver of the Miranda warnings to be valid, it must be

29

made knowingly, voluntarily, and intelligently. Id. at 598. When assessing voluntariness the court should look at the totality of the circumstances, including: (1) the duration and means of the interrogation; (2) the physical and psychological state of the accused; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; (5) and any and all other factors that could drain a person's ability to withstand suggestion and coercion. Commonwealth v. Nester, 709 A.2d 879, 882 (Pa. 1998).

This Court properly determined that Defendant's waiver of his Miranda rights was voluntary, knowing and intelligent based on the totality of the circumstances. Defendant's interview was conducted in three parts with brief breaks in-between.[165] Before the first part, the Troopers read and provided Defendant with a Pennsylvania State Police "Rights and Warning Waiver" form. This form contains the familiar Miranda warnings. Defendant signed this form, acknowledging that he understood his rights.[166] Furthermore, before each new part of the interview, the Troopers verbally informed Defendant that the same rights applied and he was free to stop the interview if he wished.[167]

Defendant's interview was not unduly long and only lasted one hour and thirty-five minutes, with breaks in-between the three parts.[168] While Defendant was incarcerated at the time of the interview, he was not handcuffed during the interview.[169] Defendant appeared calm throughout the interview. The Troopers did not raise their voice at Defendant. Defendant was aware of the nature of the interview from the

---

[165] Notes of Testimony, In Re: Pretrial Hearing, October 3; 2011, 13 (hereinafter "N.T. Pretrial at __")
[166] N.T. Pretrial at 12
[167] N.T. Pretrial at 10-11, 15, 21
[168] N.T. Pretrial at 12-13
[169] N.T. Pretrial at 10

30

beginning when he waived his rights. Defendant understood that he was talking to the Troopers about his former cellmate, Bryce, stealing some maps from him. Defendant should have been aware that any discussions or interactions between himself and Bryce would be part of the interview. Defendant's Miranda waiver was knowing, voluntary and intelligent. This Court did not err in denying Defendant's Motion to Suppress his interview statements.[170]

## V. Motion in Limine

Defendant also argues that this Court erred by refusing to grant Defendant's Motion in Limine which sought to exclude the testimony of Bryce because of the York Incident. This Court disagrees.

The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. Commonwealth v. Owens, 929 A.2d 1187, 1190 (Pa. Super. 2007) (internal citations omitted). Therefore, when reviewing a trial court's denial of a Motion in Limine, an abuse of discretion standard is used. Id. at 1190 (internal citations omitted). A trial court's ruling on the admissibility of evidence will not be disturbed unless that ruling manifests unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous. Id. at 1190 (internal quotations and citations omitted).

All relevant evidence is admissible. Pa.R.E. 402. In this case, clearly the testimony of Bryce was relevant. Bryce was the individual who Defendant solicited to murder Keys and Lloyd and the person to whom the Defendant described the 2006 incident to in detail.

---

[170] See also Order and Opinion of Court dated March 22, 2012

31

Defendant is essentially arguing that Bryce should have been barred from testifying at trial because he previously lied to officers in a similar situation. By analogy, that concept used to be the law regarding perjury convictions. Prior to 1993, when a person had been convicted of perjury, he or she was not deemed competent to testify in criminal cases. However, in 1993 the Pennsylvania Legislature amended the law to state:

> No person shall be deemed incompetent or otherwise disqualified as a witness in any criminal proceeding by reason of the person's having been convicted of perjury or subornation of or solicitation to commit perjury, but such conviction may be shown for the purpose of affecting the person's credibility.

42 Pa.C.S.A. § 5912. The legislature no longer believed that a person should be disqualified as a witness merely because they had lied in the past. The fact that Bryce had admitted to lying previously and provided false reports to law enforcement in the York Incident does not disqualify him as a competent witness. However, those convictions can and were used by Defendant in an effort to show Bryce had no credibility.

It is the jury's, as the trier of facts, responsibility to assess the credibly of the witnesses and weigh the evidence presented. Commonwealth v. Pruitt, 951 A.2d 307, 318 (Pa. 2008). Defendant had an opportunity to cross-examine Bryce about his prior convictions and his possible favorable treatment for testifying. Defendant questioned Bryce at length about the York Incident, in order to show that Bryce was also lying about Defendant's solicitation and was not credible. The jury was then free to believe all, part, or none of Bryce's testimony. Id. at 318. Bryce's credibility issues go toward the weight

32

of his testimony and not the admissibility. Therefore, this Court did not err in denying Defendant's Motion in Limine and admitting the testimony of Bryce.

### VI. Suppression of Wiretap Conversations

Finally, Defendant argues that this Court erred in not suppressing and excluding the wiretap recordings between the Defendant and Bryce for several reasons. This Court disagrees.

The standard of review for the trial court's denial of a suppression motion was discussed *supra*. An application for a wiretap must be made to a Superior Court Judge. Most importantly, the application must include a statement by an investigative officer who has knowledge of relevant information justifying the application which includes: (1) the identity of the particular person, if known, committing the offense and whose communications are to be intercepted, (2) the details as to the particular offense that has been, is being, or is about to be committed, (3) the particular type of communication to be intercepted, (4) a showing that there is probable cause to believe that such communication will be communicated on the wire communication facility or at the particular place where the oral communication is to be intercepted, (5) the character and location of the particular wire communication facility involved or the particular place where the oral communication is to be intercepted, (6) a statement of the period of time for which the interception is required to be maintained, and (7) a particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ. 18 Pa.C.S.A.§ 5709(3)(i)-(vii).

33

### a. Informant Tainted and Untrustworthy Source

Defendant argues the wiretap should have been suppressed because the Affidavit of Probable Cause should have included information that Bryce was a tainted and untrustworthy source.

While it is true that Bryce had some credibility issues, there was no evidence that he was a tainted and untrustworthy source. In fact, Trooper Wilson testified that as Bryce reiterated details of the 2006 assault, he "very quickly remember[s] exactly what case he is talking about" because Trooper Wilson was one of the responding officers to Keys' assault.[171] When Bryce tells Trooper Wilson that Defendant is soliciting him to kill both Keys and Lloyd, he remembers the names from the 2006 case.[172] During the initial interview with Bryce, Trooper Wilson excused himself to call Adams County District Attorney Shawn Wagner to confirm many of the details he heard.[173] Immediately after talking with Bryce, Trooper Wilson has corroborating details. Therefore, Bryce was not a tainted and untrustworthy source for this case, the wiretap was properly granted, and this Court did not err in denying Defendant's request to suppress the wiretap.

### b. Informant's Serious Credibility Issues

Defendant also argues that the wiretap should have been suppressed because neither the Affidavit of Probable Cause nor the Application for Oral Communications Intercept included information about Bryce's serious credibility concerns.

As discussed *supra*, even though Bryce had credibility concerns, his story was immediately corroborated by Trooper Wilson. Therefore, the application for the wiretap

---

[171] N.T. Vol. II. 361
[172] N.T. Vol II. 362
[173] N.T. Vol. II. 362-63

34

was properly granted and this Court did not err in denying Defendant's request to suppress the wiretap.

### c. Reasons for Requesting Wiretap

Defendant argues that the wiretap should have been suppressed because neither the Affidavit of Probable Cause nor the Application for Oral Communications Intercept included the reason that the intercept was requested and required because of concerns with Bryce's credibility.

In this case, Trooper Wilson testified that because this case consisted of one inmate's word against another "[w]e came to the decision fairly quickly that some type of interception or wiretap is going to be necessary."[174] In any investigation, evidence must be collected so that the Commonwealth can prove the case beyond a reasonable doubt. In this case, clearly the best evidence would be to have a recording of Defendant soliciting Bryce to murder Keys and Lloyd and discussing the 2006 assault on Keys. There was no evidence that the wiretap was obtained solely because of Bryce's credibility issues. Then Superior Court Judge Correale Stevens specifically found that there was probable cause to believe that normal investigative procedures had been tried and failed, or reasonably appeared to be unlikely to succeed given the prison setting, thus justifying the granting of the wiretap.[175] Therefore, this Court did not err in denying Defendant's Motion to Suppress the wiretap.

### d. Location of Wiretap

Defendant finally argues that the wiretap should have been suppressed because the application did not sufficiently identify the location of the wiretap.

---

[174] N.T. Vol. II. 366
[175] Order of Court: In the Matter of the Application of David J. Freed for an Order Authorizing Interception of Wire, Electronic and Oral Communications dated September 20, 2010, page 2-3.

In this case, the application for the wiretap identified Bryce and Defendant by name. The application further identified not only that the location was SCI Camp Hill, but he specified the exact cell that was the location of the wiretap.[176] This Court did not err in denying Defendant's Motion to Suppress the wiretap. It must be noted that this wiretap application was approved by then Superior Court Judge and now Pennsylvania Supreme Court Justice. Clearly, all provisions of the Wiretap and Electronic Surveillance Control Act were complied with. Therefore, Defendant's Motion to Suppress the auditory wiretap surveillance tapes and written transcription of the auditory surveillance tapes for lack of specificity, veracity, and probable cause are without merit.

## Conclusion

The evidence at trial was more than sufficient for the jury to convict Defendant of Attempted Homicide, Aggravated Assault, Burglary and two counts of Solicitation to Commit Homicide, when the evidence largely consisted of Defendant's own voice on the wiretap recordings. This Court did not err by not severing the solicitation charges from the other charges because all the evidence was linked together and established the background and history of the case. This Court did not err by denying Defendant's request for a change in venue when the solicitation charges occurred in Cumberland County and the wiretap evidence was collected in Cumberland County. This Court did not err when it admitted Defendant's statement because Defendant was provided his Miranda warnings and knowingly, voluntarily, and intelligently waived them. This Court did not err by admitting Bryce's testimony because his testimony was relevant and any credibility determinations were properly left to the jury as trier of fact. Finally, this Court

---

[176] *See* Order and Opinion of Court, In Re. Omnibus Pre-trial Motion, J. Ebert, March 22, 2012; Com. Ex. 68.

36

did not err in denying Defendant's Motion to Suppress the wiretap recording and transcript because the application for the wiretap was properly made.

By the Court

_____
M. L. Ebert, Jr.,        J.

Matthew P. Smith, Esquire
Chief Deputy District Attorney

Michael Rentschler, Esquire
Attorney for Defendant

NOV 0 4 2013

Copies mailed on _____

Copies delivered on NOV 0 4 2013

37

# Appendix A

| | |
|---|---|
| COMMONWEALTH | : IN THE COURT OF COMMON PLEAS OF |
| | : CUMBERLAND COUNTY, PENNSYLVANIA |
| | : |
| | : CP-21-CR-347-2011 |
| V. | : |
| | : CHARGE: 1. CRIMINAL SOLICITATION |
| | : TO CRIMINAL HOMICIDE (3 COUNTS); |
| | : 2. CRIMINAL ATTEMPT TO |
| | : CRIMINAL HOMICIDE; |
| | : 3. AGGRAVATED ASSAULT; |
| | : 4. BURGLARY |
| | : |
| LANCE PATRICK GREENAWALT | : |
| OTN: T029948-2 | : AFFIANT: TPR. BENJAMIN WILSON |

## ORDER OF COURT

AND NOW, this 22nd day of March, 2012, upon consideration of the Defendant's

Omnibus Pre-Trial Motion, the briefs filed by the parties in support thereof and after hearing,

**IT IS HEREBY ORDERED AND DIRECTED** that:

1. The Defendant's Omnibus Pre-Trial Motion to Suppress Statement of Defendant is

**DENIED.**

2. The Defendant's Omnibus Pre-Trial Motion to Sever Charges and Request Change of

Venue is **GRANTED** in part and **DENIED** in part. Defendant's Motion to Sever Charges is

**GRANTED.** The Defendant's Request for Change of Venue is **DENIED.**

3. The Defendant's Omnibus Pre-Trial Motion to Suppress Auditory Wiretap

Surveillance Tapes and Written Transcription of Auditory Surveillance Tapes is **DENIED.**

By the Court,

_____
M. L. Ebert, Jr.,

Matthew P. Smith
Chief Deputy District Attorney

Michael Rentschler, Esquire
Attorney for Defendant

Copies delivered on 3/22/12

Copies mailed on 3/22/12

2

| COMMONWEALTH | : IN THE COURT OF COMMON PLEAS OF |
|---|---|
| | : CUMBERLAND COUNTY, PENNSYLVANIA |
| | : |
| | : CP-21-CR-347-2011 |
| V. | : |
| | : CHARGE: 1. CRIMINAL SOLICITATION |
| | : TO CRIMINAL HOMICIDE (3 COUNTS); |
| | : 2. CRIMINAL ATTEMPT TO |
| | : CRIMINAL HOMICIDE; |
| | : 3. AGGRAVATED ASSAULT; |
| | : 4. BURGLARY |
| | : |
| LANCE PATRICK GREENAWALT | : |
| OTN: T029948-2 | : AFFIANT: TPR. BENJAMIN WILSON |

## IN RE: OMNIBUS PRE-TRIAL MOTION

**EBERT, J., March 22, 2012 –**

### Facts

On April 30, 2006, Daniel Keys was violently attacked by someone who was waiting inside his home in Adams County. Keys had boiling water thrown on his face and was severely beaten with a baseball bat. There was evidence at Keys' residence that the attacker had entered through a window above an air conditioning unit in the rear of the home. Prior to the attack, Keys had been out to dinner with John Lloyd. John Lloyd was driving that evening and dropped Keys off at his home. Other than the attacker, John Lloyd was the last person to see Daniel Keys before the attack. The Defendant has been charged with Attempted Homicide, Burglary and Aggravated Assault here in Cumberland County based on these facts.

In an unrelated matter, by complaint dated August 10, 2009, the Defendant was charged with Burglary, 2 counts of Criminal Trespass, Theft by Unlawful Taking and Receiving Stolen Property. One of the victims in that case was John Lloyd, who resided at 491 Cunningham Road in Freedom Township, Adams County, Pennsylvania. This is the same John Lloyd mentioned above. The Defendant had a jury trial in this matter and was found guilty of Burglary, Criminal

Circulated 07/31/2014 01:55 PM

Trespass and Theft by Unlawful Taking. The Honorable Michael George of Adams County Court of Common Pleas was the presiding Judge. Judge George sentenced the Defendant on April 22, 2010, to an aggregate sentence of 5 ½ years to 13 years in a State Correctional Institute.

The Defendant was placed in the State Correctional Institute at Camp Hill to serve this sentence. At Camp Hill, the Defendant's cell mate was Timothy Bryce. Bryce eventually told prison officials that the Defendant was soliciting him to commit several murders. The prison officials passed this information on to the State Police who interviewed Bryce. Bryce told the State Police that the Defendant often discussed the past events which resulted in his incarceration. He stated that the Defendant asked him to kill Judge Michael George who presided over his last trial, John Lloyd who was a past associate of the Defendant and also was involved in the case which led to his incarceration. Additionally, the Defendant told Bryce that he was the one who assaulted Daniel Keys and that he wanted him killed also.

The State Police took this information to the District Attorney of Adams County. Since the Defendant was housed in the State Correctional Institution located Cumberland County, the Cumberland County District Attorney prepared an application for a wiretap. The application was presented to Superior Court Judge Correale Stevens who ordered the wiretap. A covert wiretap was installed in a cell at the State Correctional Institute – Camp Hill and Bryce and the Defendant were moved to this cell. The wiretap was conducted from September 21, 2010 to September 23, 2010.

On October 28, 2010, Trooper Benjamin H. Wilson ("Trooper Wilson") and Trooper Scott Denish ("Trooper Denish", collectively "Troopers") conducted an interview of Defendant Lance Patrick Greenawalt ("Defendant").[1] The interview was based on two interrelated investigations: 1) Defendant's solicitation of a previous cellmate, Tim Bryce, to commit murder,

---

[1] Notes of Testimony, Pretrial Hearing, Oct. 3, 2011, 8 (hereinafter N.T. ___).

2

and Defendant's previous attempted homicide, aggravated assault, and burglary in Adams County, as well as, 2) Defendant's allegation that Bryce had stolen books and court documents from Defendant.[2]

The Troopers arrived on October 28, 2010, at the State Correctional Institution ("SCI") Camp Hill and asked security to call Defendant Lance Patrick Greenawalt ("Defendant") to be questioned.[3] Defendant was brought to a "standard 10 by 12 or 10 by 14" SCI Camp Hill security office interview room with a wooden table, chairs, and a window.[4] Defendant's handcuffs were removed and he was seated across the table from the Troopers.[5] The Troopers introduced themselves and told Defendant they were meeting to "touch base" about his allegations against Bryce.[6] Trooper Wilson told Defendant "you're free to leave, you don't have to be here, I'm asking for your time, you can stop" and then read the Pennsylvania State Police's "Rights Warning and Waiver."("waiver form")[7] Defendant agreed and signed the waiver form.[8] Defendant then told Trooper Wilson that he gave permission for the interview to be recorded.[9] Trooper Wilson turned on the audio recorder and began the interview.[10]

The Troopers interviewed Defendant for approximately an hour and a half starting at 2:10 P.M. and ending around 3:25 P.M.[11] During the interview, the Troopers took breaks at 2:30 P.M. and 2:45 P.M.[12] Trooper Wilson described the breaks as "quick" and "brief," lasting no more

[2] N.T. 8-9.
[3] N.T. 9.
[4] N.T. 8-9, 25.
[5] N.T. 10, 26.
[6] N.T. 10.
[7] N.T. 11, 27; Commonwealth Exhibit 2 (hereinafter "Comm. Ex. __). Although Trooper Wilson refers to the form as a "PSP noncustodial rights warning waiver," this Court notes that the actual form does not contain the language "noncustodial."
[8] N.T. 27.
[9] N.T. 27, 46.
[10] N.T. 27.
[11] N.T. 13; Comm. Ex. 3 line 12, 2858. Exhibit 3 indicates the start time to be 2:10 P.M. and the ending time to be 3:25 P.M.
[12] N.T. 13, 15, 18.

3

than a few minutes in length.[13] The breaks taken by the Troopers broke the interview into three parts as indicated by the three separate CD recordings.[14]

Part one of the interview, 2:10 P.M. to 2:30 P.M., was focused on the complaint filed by Defendant against Bryce that alleged theft of personal property.[15] Trooper Wilson described part one's "tone and tenor" as "very calm" and "pretty matter of fact."[16] The interview consisted of the Troopers asking Defendant about Bryce's possible motives for the alleged theft and other general information surrounding Defendant's complaint.[17] After questioning the Defendant for approximately 20 minutes, the Troopers decided to take a quick break.[18]

Part two, approximately 2:30 P.M. to 2:45 P.M., began when Trooper Wilson told Defendant that "everything still applies, referring to his rights and everything" and proceeded to question Defendant relating to his complaint.[19] After a few minutes into part two, Trooper Wilson began to ask Defendant about allegations that he solicited Bryce to commit murder and Defendant's involvement in an attempted murder in Adams County.[20] However, before the interview segued from Defendant's complaint to Defendant's solicitation, Trooper Denish interrupted and "goes through [Defendant's] rights and explains to him he doesn't have to speak...."[21] After Trooper Denish finished his explanation of Defendant's rights and choice to voluntarily cooperate, Defendant "adamantly denied" Bryce's allegations of solicitation and insisted conversations of that nature never took place between the two cellmates.[22]

---

[13] N.T. 13, 21. Trooper Wilson estimated each break to be around two minutes in length.
[14] Comm. Ex. 4. The three separate recordings will hereinafter be referred to as "part one," "part two" and "part three."
[15] N.T. 14.
[16] N.T. 15.
[17] N.T. 16.
[18] N.T. 14.
[19] N.T. 17, 29.
[20] N.T. 19-20.
[21] N.T. 17, 30; Comm. Ex. 3, line 780.
[22] N.T. 19.

4

Part three, approximately 2:45 P.M. to 3:25 P.M., began when Trooper Wilson reminded Defendant of his rights and that "[e]verything still applies that we talked about earlier[;] [w]e're not forcing you to be here."[23] During the final part of the interview, Trooper Wilson challenged Defendant's denial of solicitation and involvement in an attempted murder based upon audio recordings between Bryce and Defendant.[24] For a short time, Defendant continued to deny any solicitation for murder or attempted murder, but then "started to offer an explanation for his statements" saying that his conversations with Bryce were merely "stupid ass jail house talk" that meant nothing.[25] When asked about the "tone and tenor" of the third part of the interview, Trooper Wilson responded: "Again, the tone remains pretty much the same the whole time. It's normal conversation. Nobody ever yells or screams or, you know, anything like that."[26] After approximately 30-35 minutes into part three, Trooper Wilson decided to end the interview because questioning Defendant was not leading to any significant progress.[27]

An Omnibus Pretrial Motion to Suppress the Statements of Defendant made on October 28, 2010, Sever Charges and Request Change of Venue, and Suppress Auditory Wiretap Surveillance Tapes and Written Transcription of Auditory Surveillance Tapes arising from the transactions described above. This Court is now asked to determine if Defendant's constitutional rights were violated and should the Omnibus Pretrial Motion be granted.

---

[23] N.T. 21.
[24] N.T. 22.
[25] N.T. 22-23, 35.
[26] N.T. 23.
[27] Comm. Ex. 3, line 2855.

5

## Discussion

When a person is subjected to a custodial interrogation[28] "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). A Miranda waiver allows for incriminating statements obtained during a custodial interrogation to be "admissible where the accused's rights to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights." Commonwealth v. Davis, 861 A.2d 310, 317 (Pa. Super. 2004). "For a Miranda waiver to be valid, it must be made knowingly, voluntarily and intelligently." Commonwealth v. Paxton, 821 A.2d 594, 598 (Pa. Super. 2003). The Pennsylvania Supreme Court in Commonwealth v. Pruitt elaborated on what is required during a trial court's analysis of a valid waiver of Miranda rights:

> In considering whether a defendant has validly waived his Miranda rights, the trial court engages in a two-pronged analysis:
>
> > (1) whether the waiver was voluntary, in the sense that [the] defendant's choice was not the end result of governmental pressure[;] and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

951 A.2d 307, 318 (Pa. 2008) (quoting Miranda, 384 U.S. at 451).

---

[28] Current Pennsylvania case law has held that questioning an incarcerated person is deemed "custodial" for the purpose of Miranda, however, an extremely recent U.S. Supreme Court decision states that "imprisonment alone is not enough to create a custodial situation within the meaning of Miranda." Howes v. Fields, ---S.Ct.----, 2012 WL 538280, at *2 (stating, "Questioning a person who is already in prison does not generally involve the shock that very often accompanies arrest; a prisoner is unlikely to be lured into speaking by a longing for prompt release; and a prisoner knows that his questioners probably lack authority to affect the duration of his sentence."); but see Comm. v. Chacko, 571 A.2d 311, 315 (Pa. 1983) (stating, "Thus we conclude that, since appellant was incarcerated at the time of questioning, he was 'in custody' for purpose of Miranda."). Although the recent Howes opinion may resolve a majority of Defendant's Omnibus Pre-Trial Motion, for the sake of completeness this Court will proceed assuming, arguendo, Defendant was "in custody" for the purpose of Miranda during questioning.

"The Commonwealth bears the burden of establishing whether the defendant knowingly and voluntarily waived his or her *Miranda* rights." Id. The Pennsylvania Supreme Court in Commonwealth v. Nester described voluntariness as follows:

> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

709 A.2d 879, 882 (Pa. 1998). Additionally, when subjected to an interrogation, a suspect must "understand[] the situation" before "knowingly and intelligently" relinquishing their constitutional rights and making any inculpatory statements. See Commonwealth v. Dixon, 379 A.2d 553, 556-57 (Pa. 1977) ("Commonwealth failed to establish Linda Dixon's awareness at the time of her written 'waiver' that the death of her son was to be the subject matter of the interrogation."). Furthermore, a renewal of Miranda warnings may become necessary where the "initial warnings have become stale or remote" because a "clear continuity of interrogation" was absent. See Commonwealth v. Scott, 752 A.2d 871, 875-76 (Pa. 2000). The determination of whether initial Miranda warnings have become stale or remote is made in view of the "totality of the circumstances in each case." Id. The Pennsylvania Supreme Court has outlined what has become known as Bennett factors to help guide the courts in making such a determination:

> The length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether the statements obtained are materially different from other statements that may have been made at the time of the warnings.

Id. at 875 (quoting Commonwealth v. Bennett, 282 A.2d 276, 279 (Pa. 1971)).

7

**I. The Troopers adequately provided Miranda warnings to Defendant through the use of the Pennsylvania State Police "Rights and Warning Waiver."**

The Troopers provided Defendant with his constitutional rights by reading the Pennsylvania State Police "Rights and Warning Waiver" form and having Defendant acknowledge his understanding of those rights with his signature. The waiver form's language is reproduced below:

> You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.[29]

In accordance with Miranda, *supra*, the waiver form clearly indicates to Defendant his right to remain silent because anything he says can be used as evidence against him and his right to attorney. The waiver form is clearly marked with the location, time and date, as well as the issuing officer, Trooper Wilson, a witness, Trooper Denish, and Defendant, Lance Greenawalt. Therefore, the language of the form sufficiently provided Defendant his Miranda warnings.

**II. Defendant knowingly, voluntarily and intelligently waived his Miranda rights.**

Defendant knowingly, voluntarily and intelligently waived his Miranda rights when making the somewhat inculpatory statements about his involvement with an attempted murder and solicitation-for-murder.

**A. Defendant's waiver of Miranda rights was voluntary.**

Defendant's Miranda waiver and subsequent self-incriminating statements were not the result of governmental pressure or coercion after assessing voluntariness based upon the totality of the circumstances. Defendant's interview was not "unduly long" as it only lasted one hour and

---

[29] Comm. Ex. 2

8

thirty-five minutes in length including two short breaks. See, e.g., Nester, 709 A.2d at 883 (stating, "Nester's interview lasted only one hour and fifteen minutes, which is not unduly long.") (citing Commonwealth v. Taylor, 431 A.2d 915 (Pa. 1981) (actual period of interrogation lasting slightly more than one hour did not overwhelm defendant's will)). Also, see Commonwealth v. Rochon, cited parenthetically in Nester stating, "one hour and fifteen minute wait while handcuffed to a bar before interview was insufficient to overbear defendant's will." Id. (citing 581 A.2d 239 (Pa. Super. 1990)). Additionally, Defendant seemed calm and clear when answering the Troopers' questions with no audible indications of physical or psychological impairment and no evidence of possible deficiencies presented on the record.[30]

During the interview Defendant's handcuffs were removed even though Defendant was presently incarcerated at SCI Camp Hill. The Troopers used a professional and casual tone without raised voices when questioning Defendant.[31] Although Defendant alleges coercion in the Troopers' use of the term "liar" when confronting Defendant about previously made statements, Defendant presented no evidence as to the effect the term "liar" may have had on his state-of-mind and no interrogation tactics used by the Troopers reached a level that would drain Defendant's ability to withstand suggestion. Therefore, this Court finds Defendant's statements to be voluntarily given after assessing the voluntariness based upon a totality of the circumstances.

**B.    Defendant's waiver of Miranda rights was knowing and intelligent.**

Defendant's Miranda waiver and subsequent self-incriminating statements were knowing and intelligent because an effective Miranda warning was given prior to the start of the interview and Defendant acknowledged his rights, waived those rights, and proceeded to make somewhat

---

[30] See Comm. Ex. 4; N.T.
[31] See Comm. Ex. 4.

9

incriminating statements. Defendant was read his <u>Miranda</u> rights. He also read the rights himself, and signed the waiver form indicating he understood that he was waiving his rights. Defendant was aware of the consequences of abandoning his rights because the waiver form plainly stated, "anything you say can and will be used against you in a court of law." Additionally, even though a proper <u>Miranda</u> warning was already provided earlier, throughout the interview Defendant was reminded of his rights and indicated he was aware of his rights. Troopers went above and beyond what was expected to ensure that Defendant was aware of his constitutional rights. One example of Trooper Denish reminding Defendant of his rights is provided:[32]

| Trooper Denish: | Uh – uh, before you start, you understand that you're not under arrest – well, you're in jail, but ... |
|---|---|
| Lance Greenawalt: | Right. |
| Trooper Denish: | I'd like you to hear what we have to say ... |
| Lance Greenawalt: | Okay. |
| Trooper Denish: | ... but you can leave if you want. |
| Lance Greenawalt: | Okay. |
| Trooper Denish: | Is that fair? |
| Lance Greenawalt: | Sure. |
| Trooper Denish: | And you can stop talking, answer the questions any time of want. |
| Lance Greenawalt: | Okay. |
| Trooper Denish: | That's fair? |
| Lance Greenawalt: | Sure. |

---

[32] Comm. Ex. 3, lines 780-813.

Trooper Denish:    Okay. Um, I just want to get that clear. Don't want you to think you're – you're – the door is open. I'm sure you can't walk out, but just say, hey, I don't want to talk no more. I want to leave.

Lance Greenawalt:    Okay. Sure.

Therefore, this Court finds that the initial Miranda warnings and subsequent reminders followed by Defendant's decision to waive his Miranda rights was knowing and intelligent.

C.    Defendant was aware of the subject matter of the interview at the time of his Miranda waiver.

Defendant's interview encompassed all interactions between Defendant and former cellmate Bryce and was within the same subject matter nexus that led to Defendant's inculpatory statements. Defendant incorrectly characterizes the questioning between the Troopers and himself as falling into the same scenario as Dixon, *supra*, where the Pennsylvania Supreme Court held that Linda Dixon did not "knowingly and intelligently" relinquish her constitutional rights because she lacked an "awareness of the nature of the investigation" when signing her waiver. Dixon, 379 A.2d at 556-57.

Briefly summarized, Linda Dixon had signed a Miranda waiver relating to a malicious mischief charge, however, investigators surprised her by questioning her on a "wholly different matter" relating to the death of her child. Id. at 555-57. After being shown a photograph of her deceased child, Linda Dixon cried for ten minutes and confessed to the murder. Id. The Court reasoned, in part, that Linda Dixon did not make a knowing and intelligent waiver of her constitutional rights because an "ambiguity as to [her] understanding of the situation, an ambiguity which went unclarified by appellant's interrogators..." existed at the time of her waiver. Id. at 556-57. However, the current case can easily be distinguished from Dixon as in the Superior Court's case Commonwealth v. Fox. See 697 A.2d 995, 998-99 (Pa. Super. 1997).

11

Unlike in Dixon and similar to Fox, in the case *sub judice*, the Commonwealth has met the burden of proving by a preponderance of the evidence that Defendant knew of "the occasion for the interrogation" at the time of the Miranda waiver. Id. at 556; see Commonwealth v. Richman, 320 A.2d 351 (Pa. 1974). In Fox, the Superior Court did not suppress inculpatory statements where Fox was told that police were conducting an investigation concerning him and his daughter but was never told that the purpose of the interrogation was in regard to allegations that he sexually molested her over a period of seven years and that those allegations were the purpose of the interrogation. Id. at 999. The Superior Court reasoned that "appellee knew the 'occasion for the interrogation' at the time he waived his rights." Id. Similar to Fox, in the present case Defendant had an "awareness of a general nature of the transaction giving rise to the investigation[]" because Defendant was aware that the investigation by the Troopers could involve all conversations that occurred between Defendant and Bryce while cellmates at SCI Camp Hill. Richman, 320 A.2d at 998.

Defendant knew, or should have known, that his allegations of Bryce's thefts would include all the interactions, including conversations, he previously had with Bryce as a cellmate. A thorough investigation of Defendant's allegation against Bryce would require the Troopers to speak with and question all parties involved. The Troopers would have to inquire into conflicting allegations by confronting each accuser with contradictory information regarding all of their interactions while cellmates. Even if Defendant was not aware of the true intentions of the Troopers at the time of the interrogation, he was aware that they would be asking him about his time as a cellmate of Bryce. Therefore, the Troopers line of questioning that eventually segued into conversations about the solicitation of murder between Defendant and Bryce would be a natural progression and logically follow any inquiry about the two parties involved.

12

**III. Renewal of Defendant's Miranda warning was not necessary because of a clear continuity of interrogation.**

Taking into account the Bennett factors[33] and comparing the present case to Scott, this Court finds a clear continuity of interrogation and a renewal of Defendant's Miranda warnings to be unnecessary. See Scott, 752 A.2d at 875-76. In Scott, Appellant was read his rights only two and one-half hours before he gave his first incriminating statement, only momentary breaks in questioning occurred, and Appellant confessed in the same room where he was read his rights. Id. at 876. The only negative factor being that the Appellant confessed to a different officer than the officer who had initially read him his rights. Id. The Superior Court did not consider this one negative factor to be of sufficient weight to warrant a need to rewarn Appellant of his rights. Id. In the case *sub judice*, the Bennett factors weigh heavily in favor of a "clear continuity of interrogation" because Defendant's entire interrogation only lasted a total of an hour and a half, had only two brief breaks, was conducted within the same room that his rights were given and in front of the same troopers that read him those rights. Therefore, Defendant's Miranda warnings were fresh and no renewal of rights was required.

### Conclusion

In a final analysis it is interesting that the Defendant seeks to suppress the statements he made to the State Police on October 28, 2010. Given this Court's decision which follows in this opinion regarding the legality of the wiretap conducted by the Commonwealth from September 21, 2010 to September 23, 2010, the statements made by the Defendant as recorded during the wiretap will be admissible at trial. In reality, the Defendant made no real admissions to the State Police when they interviewed him on October 28, 2010. Accordingly, it would appear that the Defendant will continue to advocate the defense he provided to the Troopers during the

---

[33] *Supra* Discussion section.

13

interview, i.e. "... it's bullshit. You know? It's talk. It's jail talk. You know, it's inflated arrogance, ego whatever you wanna call it." Commonwealth's Exhibit 3, 8/3/11, line 1861, 1862. In essence, the Defendant has asserted that he is not guilty of solicitations to commit murder, because he never had the intent of promoting or facilitating such crimes.

Equally important is the fact that the real purpose of this interview was not to gain more incriminating evidence against the Defendant. From the State Police perspective, the wiretap conversations of the Defendant provided them with sufficient evidence to charge the Defendant with the attack on Daniel Keys. At no time during the interview does the Defendant ever admit that he attacked Daniel Keys. One does not have to be Sherlock Holmes to deduce the fact that the real purpose of this interview was to get the Defendant to state that he was hired by John Lloyd to kill Daniel Keys. When it became apparent that the Defendant was not about to do this, the interview ended. In any regard, the Defendant's Motion to Suppress is denied.

## MOTION TO SEVER CHARGES AND REQUEST CHANGE OF VENUE

I. Motion To Sever

The Pennsylvania Rules of Criminal Procedure 583 on "Severance of Offenses or Defendants" states:

> The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa. R. Crim. P. 583. "Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers under when the Commonwealth's evidence links him to a crime." Commonwealth v. Dozzo, 991 A.2d 898, 902 (Pa. Super. 2010). Rule 583 attempts to prevent a trial from including evidence that would lean toward convicting a defendant merely by showing a propensity to commit crimes, however, "the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a

14

criminal trial, and is not grounds for severance by itself." Id. The Pennsylvania Supreme Court has established the following test to govern severance issues:

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: whether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

Commonwealth v. Lark, 543 A.2d 491, 496-97 (Pa. 1988). Taking the first part of the test, a trial court must determine the admissibility of "each of the offenses" in a separate trial. Id.; see Dozzo, 991 A.2d at 902. The admissibility of evidence of other crimes is permissible to show:

> (1) motive; (2) intent; (3) absence of mistake or accident;·(4) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others .... Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts.

Dozzo, 991 A.2d at 902 (quoting Collins, 703 A.2d 418, 422-23 (Pa. 1997)); Pa. R.E. 404(b)(2). With regard to the second part of the test, the ability of a jury to separate the evidence of distinct criminal offenses, it can be said that this becomes an easier task when the criminal offenses took place at different times and at different locations. See id, at 902-903.

In the case *sub judice*, in an exercise of caution, this Court holds that severance of the charges against Defendant is warranted. There is no question that in the trial of Defendant for solicitation to commit criminal homicide, evidence of the crimes of attempted homicide, aggravated assault and burglary related to Daniel Keys will be admissible in that trial to establish motive and intent. Keys is one of the main targets Defendant solicited Timothy Bryce to murder. John Lloyd is the brother of Daniel Keys and is the individual Keys was with just prior to being assaulted on April 30, 2006. Lloyd is also one of the victims in the burglary case that resulted in

15

Defendant being sentenced to the State Correctional Institute. It was this case that Judge Michael George presided over. Clearly, all of these events are interrelated and establish Defendant's motive and intent with regard to the solicitation to commit homicide.

However, when one considers the attempted homicide and aggravated assault on Daniel Keys and the burglary of Keys' home, all of which took place on April 30, 2006, in Adams County, evidence of the solicitation to murder Judge George which took place in Cumberland County, would not be admissible in the trial of these crimes. Solicitation to murder Judge George took place 4 years after the actual attack on Keys. To inject into the attempted homicide trial evidence that Defendant solicited Bryce to murder a Common Pleas Judge would unduly prejudice the Defendant by showing that he has a propensity for serious violence. For a jury to hear the wiretap evidence regarding Defendant's statements on how he violently and viciously assaulted Daniel Keys and then to also hear that on an unrelated matter he wanted to have a Judge murdered is in this Court's eyes very damning and clearly prejudicial.

## II. Request to Change Venue

Subject matter jurisdiction and proper venue "must exist simultaneously in order for a court to properly exercise its power to resolve a particular controversy." Commonwealth v. Bethea, 828 A.2d 1066, 1075 (Pa. 2000). "Subject matter jurisdiction relates to the competency of a court to hear and decide the type of controversy presented." Id. at 1074. "Venue relates to the right of a party to have the controversy brought and heard in a particular judicial district." Id.; Commonwealth v. Brookins, 10 A.3d 1251, 1258-59 (Pa. Super. 2010). All Pennsylvania courts of common pleas possess subject matter jurisdiction in controversies arising out of the Pennsylvania Crimes Code. See Bethea, 828 A.2d at 1074-75 (citing 18 Pa.C.S. § 102). "Generally, venue begins in the court with a geographic connection to events at issue." Id. at

16

1075. The party seeking to change venue "bears the burden of showing that such a change is necessary and must demonstrate that he or she cannot receive a fair and impartial trial in the county in which venue was originally established." Brookins, 10 A.3d at 1259. Important factors to consider in evaluating the likelihood of prejudice within a certain venue are: 1) Will the defendant incur an undue expense? 2) Will the defendant be able to obtain defense witnesses or evidence? 3) Did the prosecution engage in forum shopping to obtain an advantage over the defense? 4) Did pre-trial publicity make a fair trial unlikely? See id.

In the case *sub judice*, subject matter jurisdiction and proper venue are present. Subject matter jurisdiction is established through the numerous charges against Defendant arising out of the Pennsylvania Crimes Code. As the moving party, Defendant had the burden to demonstrate that Cumberland County, as the originally established venue, would prejudice his trial. Venue is proper because Defendant has failed to establish that he cannot receive a fair and impartial trial in Cumberland County and that a change of venue to Adams County is necessary. Nothing on the record suggests 1) that Defendant would incur any undue expense, 2) that he would not be able to obtain witnesses or evidence, 3) that the prosecution engaged in forum shopping, and finally 4) that pre-trial publicity would make having a fair trial unlikely. Therefore, Defendant's request for a change of venue is denied.

On a practical note, this Court is aware of the fact that Adams County, the 51st Judicial District, has four judges of which Judge Michael George remains an active member of that bench. Accordingly, given the fact that the Defendant is charged with soliciting the murder of one of their colleagues, the most practical solution is not to have Lance Greenawalt tried in Adams County. Additionally, after reviewing the contents of the wiretap, Defendant makes numerous references to the fact that he has personal connections with the current District

17

Attorney of Adams County. Given these statements, it is highly likely that the District Attorney of Adams County would recuse himself from this prosecution requiring the Pennsylvania Attorney General or a special prosecutor to step in to conduct the trial of this case.

Additionally, Carlisle, being less than 28 miles from Gettysburg, is a convenient forum for all the witnesses including the Defendant who remains housed at SCI-Camp Hill, in Cumberland County. This case was investigated by the Pennsylvania State Police who have statewide jurisdiction. While the alleged offense occurred in Adams County and was investigated by the State Police there, no evidence was developed for over 4 years in Adams County which linked the Defendant to the alleged crime. The evidence against the Defendant was obtained by the State Police by use of a wiretap which was conducted in Cumberland County. For all of these reasons, Cumberland County is the fairest and most practical venue for trial of this case.

## MOTION TO SUPPRESS AUDITORY WIRETAP SURVEILLANCE TAPES AND WRITTEN TRANSCRIPTION OF AUDITORY SURVEILLANCE TAPES

### Discussion

The requirements for a valid search warrant and wiretap authorization were satisfied by the Commonwealth. The Commonwealth's application adequately provides the particularity and veracity needed to describe the persons and place to be searched. See 18 Pa. C.S.A. § 5709(3)(iv); Pa. R. Crim. P. 205(3). The Commonwealth's application list Defendant and inmate Bryce by name as well as their SCI Camp Hill identification numbers. Additionally, the cell of Defendant and Bryce is identified. Furthermore, the trooper submitted an affidavit of probable cause that specifically corroborated the details outlined by Bryce.

18

One cannot lose sight of the fact that in Pennsylvania wiretapping is considered a very restricted investigative tool. It is tightly controlled by the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5701 et. seq. Only a Judge of the Superior Court of Pennsylvania may authorize a wiretap of the type utilized in this case. Here, the learned Correale Stevens, Judge of the Superior Court, specifically approved a six page Order allowing the District Attorney of Cumberland County and Pennsylvania State Police to install and conduct this wiretap. All provisions of the Wiretapping and Electronic Surveillance Control Act were complied with. Therefore, Defendant's Motion to Suppress the auditory wiretap surveillance tapes and written transcription of auditory surveillance tapes for lack of specificity, veracity, and probable cause are without merit.

## Conclusion

This Court finds (1) that Defendant knowingly, intelligently, and voluntarily waived his valid Miranda warnings, (2) that severance of charges is warranted, (3) that change of venue is unwarranted, and (4) that the search warrant and wiretap were valid. For all of the above mentioned reasons, Defendant's Omnibus Pretrial Motion should be granted in part and denied in part.

Accordingly, the following Order will be entered:

AND NOW, this 22nd day of March, 2012, upon consideration of the Defendant's Omnibus Pre-Trial Motion, the briefs filed by the parties in support thereof and after hearing,

**IT IS HEREBY ORDERED AND DIRECTED** that:

1. The Defendant's Omnibus Pre-Trial Motion to Suppress Statement of Defendant is **DENIED**.

19

2. The Defendant's Omnibus Pre-Trial Motion to Sever Charges and Request Change of Venue is **GRANTED** in part and **DENIED** in part. Defendant's Motion to Sever Charges is **GRANTED**. The Defendant's Request for Change of Venue is **DENIED**.

3. The Defendant's Omnibus Pre-Trial Motion to Suppress Auditory Wiretap Surveillance Tapes and Written Transcription of Auditory Surveillance Tapes is **DENIED**.

By the Court,

_____
M. L. Ebert, Jr.,                    J.

Matthew P. Smith
Chief Deputy District Attorney

Michael Rentschler, Esquire
Attorney for Defendant

20